602 A.2d 701

John William BARNHARD, Jr.

v.

STATE of Maryland.

No. 39, Sept. Term, 1991.

Court of Appeals of Maryland.

March 9, 1992.

Murray L. Deutchman, Rockville, for petitioner.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

As the result of an incident which occurred in the early morning hours of November 27, 1989, at Bubba Louie's Bar in Wheaton, John William Barnhard, Jr., the petitioner, was charged in the District Court of Maryland, sitting in Montgomery County, with assault and battery upon three members of the Montgomery County Police Department, resisting arrest, and disorderly conduct. These charges were transferred to the Circuit Court for Montgomery County when Barnhard prayed a jury trial. At his trial the jury convicted him of resisting arrest but acquitted him of the other charges. The court imposed a suspended sentence.

Barnhard appealed that judgment to the Court of Special Appeals, arguing that there was insufficient evidence of resisting arrest and, alternatively, that the jury was improperly instructed on the law of arrest and on the jury's role as judge of the law. The Court of Special Appeals affirmed. *Barnhard v. State,* 86 Md.App. 518, 587 A.2d 561 (1991). We granted Barnhard's petition for certiorari to review the decision of the intermediate appellate court.

I.

According to the State's evidence, on November 27, 1989, Montgomery County police officers responded to a report of a stabbing at Bubba Louie's Bar. The first officers to arrive were Sergeant Patricia Hickey and Officer Donald Johnson. Upon arrival, Sergeant Hickey and Officer Johnson, who were in uniform, encountered Barnhard on the sidewalk in front of the bar, blocking the entrance into the bar. Barnhard refused the officers' request to move from the doorway and threatened Sergeant Hickey and Officer

Johnson with a three-foot long stick.[1] According to Sergeant Hickey's testimony, Barnhard shouted obscenities at the officers and declared that the only way he would put down the stick and move from the entrance was if the police pulled their guns and killed him. As more police officers arrived at the bar, Barnhard finally ceased blocking the entrance. More concerned with the stabbing inside than with Barnhard's aberrant conduct, Sergeant Hickey and Officer Johnson proceeded immediately into the bar to render aid to the victim and to investigate the stabbing.

After ministering to the victim and speaking with patrons in the bar, Sergeant Hickey went back outside to try and determine where the stabbing took place. While outside, she again encountered Barnhard. This time Barnhard was more conciliatory. He offered to show Sergeant Hickey where the knife used in the stabbing had been discarded. Sergeant Hickey and Barnhard also talked about what Barnhard knew of the stabbing. Sergeant Hickey testified that during this conversation she noted that Barnhard's speech was slurred, that his eyes were bloodshot, and that he smelled of alcohol. She also stated that he admitted to consuming six beers and to being drunk. As a result of this conversation, Sergeant Hickey directed Barnhard back inside the bar and asked him to wait so that he could talk to the detective who was on his way. Sergeant Hickey wanted Barnhard interviewed because she believed that he was a material witness to at least a portion of the stabbing incident.

Moments later, Detective Daniel C. Frishcorn arrived and took control of the crime scene. He directed the officers to obtain the names, addresses, and telephone numbers of the witnesses so that they could be interviewed later. Frishcorn felt that a large number of the potential witnesses had probably consumed alcohol, and he preferred to interview them when they were sober.

---

1. In his testimony, Barnhard explained that the stick was an ax handle.

One of the officers collecting witness information was Officer Evan Thompson.  After interviewing several potential witnesses seated at the bar, Officer Thompson came upon Barnhard who was seated at the rear of the bar.  Barnhard refused to give his full name or address.  At the time, Officer Thompson was under the impression that Barnhard was a principal witness to the stabbing; therefore, he continued to request the identifying information.  Barnhard repeatedly declined.  Barnhard then got up and walked toward the front of the bar.  Officer Thompson followed Barnhard.

As Barnhard approached the front of the bar, he attempted to walk through the roped-off crime scene.  Detective Frishcorn prevented Barnhard from entering the roped-off area and asked Officer Thompson if he had Barnhard's information.  Thompson replied that Barnhard would not disclose the information.  Frishcorn then explained to Barnhard that he was a potential witness to the stabbing and that they needed his name.  At this point, Sergeant Hickey, who was standing next to Frishcorn, intervened and asked Barnhard repeatedly for his name.  Barnhard still refused.  Sergeant Hickey then asked Frishcorn what to do.  Frishcorn replied, "if he doesn't give us his name we're going to take him into custody."

In response to Frishcorn's comment, Barnhard immediately became boisterous.  First, he told the police that they would have to lock him up.  Next, he removed his jacket, threw it onto a pinball machine and shouted, "If you think you've got a stabbing, you're going to have a shooting."  Barnhard then balled his fists, taunted the officers with obscenities, threatened to kill Sergeant Hickey, and dared the police to lock him up.  The crowd in the bar became aroused.

Sergeant Hickey responded to Barnhard's actions by touching him on the shoulder and advising him that he was under arrest for disorderly conduct.  As Sergeant Hickey attempted to handcuff Barnhard, Barnhard broke free and started swinging the loose handcuff at Hickey and Officers

Thompson and Neville. A scuffle ensued, and Sergeant Hickey struck Barnhard several times with a flashlight. Barnhard was finally subdued.

Barnhard, in his testimony, contradicted nearly every aspect of the testimony of the State's witnesses. He denied any abusive conduct towards the police officers when they first arrived on the scene. He testified that he was not drunk but that he had only ordered one beer before the stabbing occurred at the bar. He claimed that he politely informed the officers that he did not want to identify himself and testified that when he did so, they arrested him. It was only at that point, according to Barnhard, that he entered into a physical and verbal confrontation with the officers in an effort to resist what he deemed to be an illegal arrest. His testimony was substantially corroborated by several of his acquaintances who were present at the time.

## II.

In urging this Court to overturn his conviction for resisting arrest, Barnhard's essential claim is that his resistance was justified because he was illegally arrested by the police when they informed him that he could not leave without divulging his identity. Accordingly, Barnhard maintains that his resistance, first with words, then with threatening gestures, and finally with physical force, amounted to lawful resistance to an illegal arrest.

Specifically, Barnhard contends that the trial court erred by: 1) failing to instruct the jury that the conduct of the police in informing Barnhard that he would be taken into custody if he did not reveal his identity amounted to an unlawful arrest as a matter of law; 2) instructing the jury that it was bound by the court's instructions as to the applicable law and preventing Barnhard's counsel from arguing his interpretation of the law; and 3) denying his motion for a judgment of acquittal on the crime of resisting arrest. Because we find all of Barnhard's claims meritless,

we shall affirm the judgment of the intermediate appellate court.

## III.

The trial court delivered extensive instructions to the jury on the resisting arrest charge. With respect to the encounter with Barnhard in the bar, the court stated:

"That there was an encounter that took place, an initial encounter of some sort between the police officers and the Defendant. You are advised that the officer, let me speak generically here for a moment; officers have the right to detain an individual briefly short of arresting him for purposes of questioning where a crime has been committed and the individual is known to have been a witness to that crime.

"Now, this is short of arresting, understand; questioning. For purposes of this case you may also assume that the Defendant had the right to refuse to identify himself to the officers. He needn't answer that question. The issue in this case, or one of the underlying issues in this case is whether in refusing to identify himself to the officers the Defendant did so in a way as to engage in disorderly conduct.

"That is the issue in this case, not whether or not he had a right to refuse but whether he in some fashion refused to do so in a disorderly fashion. Now, you are going to consider this in two ways because I am going to go back and give you the specific ways in which this develops in a moment.

"One of the questions you are going to have to answer in this case is did the Defendant commit disorderly conduct because that is one of the charges he is concerned with. The State is going to have to prove each and every element beyond a reasonable doubt and I will tell you about the elements in disorderly conduct in a minute.

"Now, there is a second way in which you have to consider the disorderly conduct charge and that is in connection with the resisting arrest. The question you

are going to have to answer there is did the police have probable cause to believe that the Defendant committed disorderly conduct.

"In other words, the police when they arrested him may have had good—some sufficient reason—I will explain what this means in a moment—to arrest him even though in the end he ends up not being guilty of disorderly conduct. If the police had probable cause, something less than that, to arrest him for then he yet may be guilty of resisting arrest even though you would finally find him not guilty of disorderly conduct.

"If the police had reasonable cause at the time they attempted to do so you could still find him guilty of resisting an arrest, a lawful arrest, on the theory that the police do not always know and can't prove then and there that somebody is absolutely guilty of an offense but there may be reason within which somebody can be apprehended.

"I just want you to see that that is the way that disorderly conduct functions. In the one instance you are going to have to find that in fact he was guilty of disorderly conduct and then when we talk about resisting arrest you are going to have to consider disorderly conduct whether the police had probable cause to believe, that is something less than absolute proof to believe that he was guilty of disorderly conduct."

The court emphasized that the jury could find Barnhard not guilty of disorderly conduct if the conduct occurred subsequent to the arrest and the conduct was committed resisting an unlawful arrest. Conversely, the court pointed out that if the conduct occurred before the arrest, it could serve as the basis of a lawful arrest.

The court then instructed the jury on the elements of the crime of disorderly conduct, followed by a detailed instruction on the elements of the crime of resisting arrest. The court stated that the prosecution had the burden of proving that: 1) the defendant was arrested; 2) the arrest was lawful; and 3) the defendant resisted or refused to submit

to that arrest. Next, the court defined arrest and what constituted a lawful arrest:

"Arrest: it is generally recognized that an arrest means the taking, seizing or detaining of the person of another A, by touching or putting hands on him; B, by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest; or C, by the consent of the person to be arrested.

"So four elements ordinarily have to come together to constitute a legal arrest. There has to be an intent to arrest by the officer who arrests; it has to be number two, done under real or pretended authority; number three, it has to be accompanied by a seizure or detention of the person; and number four, it has to be understood by the person who was arrested that in fact it is an arrest that is going on.

"Those are components of the idea of an arrest, what is needed for there to be an arrest. I told you that an arrest has to be lawful. An arrest is deemed lawful where the arresting officer or officers have probable cause to make the arrest of a particular person.

"Probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person or one of reasonable caution in believing under the circumstances shown that the suspect has committed or is committing or is about to commit an offense."

Finally, the trial court noted that if an arrest is unlawful, then the arrestee can use any reasonable means, including force, to escape.

## IV.

█ Barnhard's first contention is that the trial court should have instructed the jury that he was arrested at the point when the police advised him that he would be taken into custody if he failed to disclose his identity. The validi-

ty of that contention depends upon whether the requested instruction correctly states the applicable law of arrest. Maryland Rule 4–325(c); *Lansdowne v. State*, 287 Md. 232, 239, 412 A.2d 88, 91 (1980).

In *Little v. State*, 300 Md. 485, 509–10, 479 A.2d 903, 915 (1984), we considered the question of what constitutes an arrest under Maryland common law. Chief Judge Murphy, speaking for the Court, stated:

"We have defined an arrest in general terms as the detention of a known or suspected offender for the purpose of prosecuting him for a crime. *Bouldin v. State*, 276 Md. 511, 516, 350 A.2d 130 (1976); *Cornish v. State*, 215 Md. 64, 137 A.2d 170 (1957). An arrest is effected (1) when the arrestee is physically restrained or (2) when the arrestee is told of the arrest and submits. *Bouldin, supra*, 276 Md. at 516, 350 A.2d 130. In sum, 'an arrest is the taking, seizing or detaining of the person of another, *inter alia*, by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest. *Morton v. State*, 284 Md. 526, 530, 397 A.2d 1385 (1979)."

The police action in question in the instant case does not meet any of those definitions. When Barnhard was advised that he would be taken into custody if he failed to identify himself, he was not physically restrained or otherwise subjected to the control of the police officers. Moreover, there was no evidence demonstrating an intent by Barnhard to submit to the police. In response to Detective Frishcorn's statement that Barnhard would be taken into custody if he failed to disclose his identity, Barnhard's immediate reaction was antagonistic and uncooperative. Initially, Barnhard declared that the police would have to lock him up before they would be able to take him into custody. Next, he threw his jacket onto a pinball machine and shouted "If you think you've got a stabbing, you're going to have a shooting." He then clenched his fists, taunted the officers with obscenities, and challenged them to lock him up. Under these circumstances, it is manifest that Barnhard did

not intend to submit to the police, and, therefore, as a matter of law, he was not arrested at the point when he was informed he would be taken into custody if he failed to disclose his identity. Consequently, Barnhard's requested instruction to the contrary was properly refused.

## V.

■ Barnhard next contends that the trial court erred by: 1) instructing the jury that it was bound by the court's instructions as to the law to be applied in the case, and 2) preventing counsel from arguing Barnhard's interpretation of the law to the jury. He supports these claims by underscoring Article 23 of the Maryland Declaration of Rights which provides:

"In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction."

In addition, Barnhard cites this Court's decisions in *Schanker v. State*, 208 Md. 15, 116 A.2d 363 (1955) and *Dillon v. State*, 277 Md. 571, 357 A.2d 360 (1976). In *Schanker*, we held that "[u]nder our almost unique constitutional provision any instructions on the law which the court may give are purely advisory and the court must so inform the jury." *Schanker, supra*, 208 Md. at 21, 116 A.2d at 366. Later, in *Dillon*, we reaffirmed this principle, and went on to explain that defendants are also entitled to have their counsel argue to the jury their legal theories, even when these theories may be contrary to the trial court's advisory instructions. *Dillon, supra*, 277 Md. at 581, 357 A.2d at 366.

Although Barnhard correctly cites our holdings in *Schanker* and *Dillon*, his reliance on them is outdated. Since our decisions in those cases, our recent opinions have interpreted Article 23 in a less literal manner, and the language used in *Schanker* and *Dillon* has been eroded. *In re Petition For Writ Of Prohibition*, 312 Md. 280, 539 A.2d 664 (1988); *Montgomery v. State*, 292 Md. 84, 437 A.2d 654 (1981); *Stevenson v. State*, 289 Md. 167, 423 A.2d

558 (1980), *later proceeding,* 299 Md. 297, 473 A.2d 450 (1984). In *Stevenson, supra,* 289 Md. at 176–79, 423 A.2d at 563–64, we recognized that:

"Despite Article 23's facial breadth, it is a postulate well recognized in the prior decisions of this Court, and one which the United States Supreme Court correctly observed in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that Article 23 'does not mean precisely what it seems to say.' ... [Rather,] the jury's role in judging the law under Article 23 is confined 'to *resolv[ing] conflicting interpretations of the law [of the crime]* and to decid[ing] whether th[at] law should be applied in dubious factual situations' ..."

(citations omitted).

Later in *Montgomery,* we further refined the jury's role as the judge of the law. We there held that the jury's right to judge the law

"is limited to those instances when the jury is the final arbiter of the law of the crime. Such instances arise when an instruction culminates in a dispute as to the proper interpretation of the law of the crime for which there is a *sound basis.* Under such circumstances, counsel are granted leave to argue contrary to the court's instruction on the law of the crime and this is the occasion when Article 23 and Rule 757 b [now Rule 4–325(c) ] require the court's instruction to be advisory. Even here, counsel may not in their arguments attempt to persuade the jury to enact new law or repeal or ignore existing law. However, in those circumstances where there is no dispute nor a sound basis for a dispute as to the law of the crime, the court's instructions are binding on the jury and counsel as well."

*Id.* [292 Md.] at 89, 437 A.2d at 657 (emphasis in original). *See also In re Petition For Writ Of Prohibition, supra,* 312 at 318, 539 A.2d at 682 ("What it all boils down to now is that the jury's right to judge the law is virtually eliminated: the provision, as we have construed it, basically protects the jury's right to judge the facts.").

Thus, under current law if there is *no sound basis for a dispute as to the law of the crime,* the court's instructions are binding on both the jury and counsel. As we explained in Parts III and IV, *supra,* we believe that the trial court's instructions covered all the possibilities arising out of the facts in this case, and Barnhard has presented no sound basis for disputing the law as instructed. Therefore, the trial court correctly ruled that its instructions as to the applicable law were not merely advisory and that Barnhard's counsel could not assert his interpretation of the law in his closing argument to the jury.

## VI.

Barnhard finally contends that there was insufficient evidence to sustain his conviction for resisting arrest. In support of this argument, Barnhard again relies on his theory that the police unlawfully arrested him when he was informed that he could not leave without giving his name.

It is well settled that an individual who is subjected to an illegal arrest may resist such an arrest using any reasonable means, including force, to effect his escape. *Williams v. State,* 204 Md. 55, 102 A.2d 714 (1954); *Sugarman v. State,* 173 Md. 52, 195 A. 324 (1937). Nevertheless, as discussed in Part IV, *supra,* the evidence in this case does not establish that Barnhard was arrested until the officers announced that he was under arrest and physically restrained him.

When evaluating a claim relating to sufficiency of the evidence, the proper inquiry for this Court is not whether we would have reached a different result, but instead whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *Bedford v. State,* 293 Md. 172, 175, 443 A.2d 78, 80 (1982). By adhering to such a standard, this Court appropriately respects the

role of the jury, which is to "fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson, supra,* 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573.

In the instant case there was sufficient evidence presented at trial demonstrating that Barnhard's actions, prior to the time when the officers announced that he was under arrest and physically restrained him were disorderly and disrupted the police investigation of a serious crime.[2] Several police officers testified that Barnhard attempted to walk through the roped-off crime scene. Since the officers had been called to the scene of a serious crime, and since Barnhard had indicated that he possessed material information relating thereto, the officers had the right and the duty to seek his identification. In *Watkins v. State,* 288 Md. 597, 605, 420 A.2d 270, 274 (1980), we observed:

> " '[W]here a crime may have been committed and a suspect or important witness is about to disappear, it seems irrational to deprive the officer of the opportunity to "freeze" the situation for a short time, so that he may make inquiry and arrive at a considered judgment about further action to be taken. To deny the police such a power would be to pay a high price in effective policing and in the police's respect for the good sense of the rules that govern them,' "

[quoting from ALI, A Model Code of Pre–Arraignment Procedure § 110.2, at 272 (Commentary 1975) ]. There was abundant evidence that Barnhard's response to the officers' request that he identify himself greatly exceeded a mere refusal to do so. Several police officers testified that

---

**2.** Barnhard was arrested for disorderly conduct and was subsequently charged with resisting that arrest. No attempt was made by the officers to place him under arrest prior to his conduct which followed the police advice that he would be taken into custody if he refused to identify himself. Nevertheless, Barnhard's conduct at the scene of a serious crime prior to being given that advice may have justified his arrest for the common law crime of resisting, hindering, or obstructing an officer in the performance of his duties. See *Busch v. State,* 289 Md. 669, 675–77, 426 A.2d 954, 957–58 (1981).

Barnhard taunted the officers with obscenities, threatened to kill Sergeant Hickey, and incited the crowd against the officers. Based on such evidence, we hold that a rational jury could have found that the officers had probable cause to arrest Barnhard for disorderly conduct.[3]

■ With respect to Barnhard's actions after the officers placed him under arrest, testimony indicated that Barnhard resisted the police by attempting to strike them with a loose handcuff and punching them. Barnhard, himself, does not dispute that he attempted to resist; rather, he claims that the arrest occurred prior to the officers' physically restraining him. Therefore, viewing such evidence in the light most favorable to the State, we hold that a rational jury could reasonably find that Barnhard resisted a lawful arrest for disorderly conduct. *Sharpe v. State*, 231 Md. 401, 190 A.2d 628 (1963).

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS IN THIS COURT AND IN THE

---

**3.** Maryland Code (1957, 1987 Repl.Vol.), Article 27, § 123(a) provides:
    "A person may not act in a disorderly manner to the disturbance of the public peace, upon any public street, highway, alley, park or parking lot, or in any vehicle that is in or upon any street, highway, alley, park or parking lot, in any city, town, or county in this State, or at any place of public worship, or public resort or amusement in any city, town or county in this State, or in any store during business hours, or in any elevator, lobby or corridor of any office building or apartment house having more than three separate dwelling units, or in any public building in any city, town or county of this State."
    In *Drews v. State*, 224 Md. 186, 192, 167 A.2d 341, 343–44 (1961), *vacated on other grounds sub nom, Drews v. Maryland*, 378 U.S. 547, 84 S.Ct. 1900, 12 L.Ed.2d 1032 (1964) we explained:
    "The gist of the crime of disorderly conduct under Sec. 123 of Art. 27, as it was in the cases of common law predecessor crimes, is the doing or saying, or both, of that which offends, disturbs, incites, or tends to incite, a number of people gathered in the same area. 3 Underhill, *Criminal Evidence*, Sec. 850 (5th Ed.), adopts as one definition of the crime the statement that it is conduct 'of such a nature as to affect the peace and quiet of persons who may witness the same and who may be disturbed or provoked to resentment thereby.'"

COURT OF SPECIAL APPEALS TO BE PAID BY PETI-TIONER.