997 A.2d 899

**Andre Devon ARTHUR**

v.

**STATE of Maryland.**

**No. 400, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

July 2, 2010.

Marc A. DeSimone, Jr. (Nancy S. Forster, Public Defender, on the brief), Baltimore, MD, for appellant.

Edward J. Kelly (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., MATRICCIANI, and PAUL E. ALPERT (Retired, Specially Assigned), JJ.

MATRICCIANI, J.

Andre Devon Arthur, appellant, was convicted by a jury in the Circuit Court for Frederick County of failure to obey a lawful order and resisting arrest. The court sentenced him to a term of sixty days incarceration for failure to obey a lawful order, and to a consecutive one year term of incarceration for resisting arrest. Appellant presents two questions on appeal:

I. Did the court err in failing to instruct the jury, upon request, that a person is privileged to resist an unlawful arrest and that if they found that Mr. Arthur was unlawfully arrested they should acquit him of the crime of resisting arrest?

II. Is the evidence sufficient to sustain Mr. Arthur's convictions for failure to obey a lawful order and resisting arrest?

For the following reasons, we shall affirm.

## FACTS

Frederick Police Corporal Eric Stanley testified that on the night of July 4, 2007, he was working as a Patrol Officer in Frederick when he came upon Andre Arthur, whom he identified at trial as appellant. He recounted that 10 or 15 minutes before midnight, he was driving his patrol vehicle very slowly northbound on Market Street approaching Third Street. He observed a group of three people in the 300 block of Market

Street, very close to the intersection, walking northbound. There was no one else in the vicinity. He noticed that appellant reached down and picked up a newspaper left on the sidewalk next to a small tree. Corporal Stanley continued driving northbound and as he passed the threesome, he noticed that appellant had the paper in his hand. As soon as he drove past appellant, he heard "the thump of an item hitting my patrol vehicle." When Corporal Stanley heard the thump he looked in his side view mirror and noticed that appellant was no longer holding the newspaper. Believing that appellant had thrown the newspaper at his vehicle, he exited his police vehicle and said, "Hey, let me talk to you." Appellant responded by yelling obscenities at the officer and "specifically said ['] you get the fuck away from me, leave me the fuck alone,['] ah, these types of things." Corporal Stanley told appellant to settle down and that he needed to talk to him, and asked appellant what was going on. Appellant continued his "verbal onslaught." At that point, they had neared the Old Town Tavern entrance. There were several people standing outside the tavern, "just patrons in and out," looking toward them. Corporal Stanley explained that while it was "not uncommon for people to look at the police," "it's also not uncommon for them to go about their, their own business as soon as they, you know, they're not the subject of what it is that we're, we're trying to do—" The patrons of Old Town Tavern, however, kept watching him and appellant. As appellant continued his obscenities, "people began to look my way and it was at that time I told him to lower his voice, to settle down, and he continued to refuse. He was trying to leave from me and I told him that he was under arrest."

As he told appellant that he was under arrest, Corporal Stanley placed his hands on appellant's shirt. Appellant "continued to try to pull from me in, in a yanking, jerking motion. Standing there and trying to, to hold onto him and I called for another police officer to back me up to affect [sic] the arrest. He continued to try to pull away from me."

Officer Wharton arrived in response to Corporal Stanley's call, and the two officers tried to handcuff appellant. They

tried to take him "to the ground." On the ground, appellant continued to kick and pull. Officer Cirko arrived and assisted with the arrest. Corporal Stanley suffered a sprained ankle during the struggle with appellant. Corporal Stanley allowed the other officers to handcuff appellant, and they took appellant into custody. Corporal Stanley went to the hospital because of his ankle injury, so Officer Cirko completed the paperwork on the arrest.

Corporal Stanley testified that he was not angry that someone threw a newspaper at his cruiser, but that he found it dangerous.

On redirect, the officer reiterated what happened when he approached appellant: "He became disorderly, yelling, you know, drawing the attention of the people in front of the bar, screaming obscenities."

As noted, Frederick Police Officers Cirko and Wharton responded to Corporal Stanley's call for assistance. Officer Wharton testified that when he arrived, he saw Corporal Stanley struggling with appellant. It looked to him as though Corporal Stanley was trying to get appellant's arm behind his back, and Corporal Stanley was being pushed up against the wall. There was "a crowd that was getting closer and closer." Officer Wharton related that "[o]ne of the guys from the crowd was, ah, was yelling at both, both of 'em. I, I think he was trying to break it up, but I wasn't sure, but the first thing I did was try to get him to step back so I, so he didn't jump in or anything."

Officer Cirko testified that when he arrived, Corporal Stanley and Officer Wharton "were actively on the ground with Mr. Arthur in a scuffle." Officer Cirko noticed that Officer Wharton had one of appellant's hands handcuffed and that Corporal Stanley was holding appellant down. Officer Cirko grabbed appellant's other hand and he and Officer Wharton were able to get appellant handcuffed. Officer Cirko said that appellant was taken to the hospital complaining of injuries.

Danielle Nicole Brigham, appellant's girlfriend, testified for the defense. She reported that she was with appellant at

approximately midnight on July 4, 2007. She testified to a different version of what happened:

We were walking coming from Baker Park and I had stopped to talk to my friend, who I'd seen on the street, on Market because there was a bunch of people on Market street. I had stopped to say hi. As I was going forward, um, I turned around and there was a cop that was approaching Andre and he had asked him to put his hands behind his back and I, Andre had asked, you know, why, why am I getting arrested? Why am I getting arrested? And I had also asked too and he just told him to put his hands behind his back.

\* \* \*

And then he had asked him to put his hands behind his back. He did so. He, I don't want to say forcefully, but had put him on the ground and had put him eventually in the back of the car.

On cross-examination, Brigham reported that she had "just seen a cop car stop and I had seen that, you know, the cop was approaching him." She affirmed that appellant was taken to the hospital that night. She assumed that it was for injuries he sustained during the arrest because he did not have any injuries before that.

Appellant's counsel also called Dasean Arthur, appellant's brother, to the stand. He testified that they were coming from the fireworks display at Baker's Park and were walking to a convenience store. He reported that he was about "two car lengths" from appellant and Brigham. As he was going into the store, he turned around to see if appellant wanted anything from the store and saw the police officer approach. The officer was putting the handcuffs on appellant, and appellant was asking why he was getting arrested. At that point, Corporal Stanley "grabbed him and just threw him to the ground for no reason like."

Appellant also testified as to his version of events:

Well, around, I would say around 10:00 in the evening, fireworks just displayed, me and my girlfriend and my

brother, we were walking from the, from Baker Park. We were actually walking up to Market Street. While we're walking up Market Street I'm being approached by a police officer and while I'm approached by him he's telling me, you know, place your hands behind your back. I automatically asked him, this is before, you know, he tried to arrest me, I automatically asked him was I, am I under arrest. He said no. So I continued to walk. I walked ahead. I was yelling to my brother telling him, you know, the officer, he's you know, he's harassing me right now. That's how I took it. Like he was actually trying to get, not harassing me, I not gonna say harassing me, but you know, he—

—was asking me questions.

Appellant further testified that he picked up the newspaper and threw it across the street, but not at or on the officer's car, and he did not hit any vehicle with it. When the officer saw appellant throw the paper across the street, he "jumped out his car," and appellant got defensive. Appellant averred that the officer never said he wanted to detain him and just told him to place his hands behind his back, and the officer tried to arrest him but did not tell him why. Appellant asked whether he was under arrest, and the officer said, "no," so appellant continued to walk. Then, the officer grabbed him by the shirt and "slammed" him up against the wall. Appellant testified that he told the officer that he did not need to be so aggressive and put one of his hands behind his back, at which point the officer brought him to the ground by "sweeping" one of his legs:

I fell down onto my shoulder. After I fall down onto my shoulder another officer comes and he's trying to handcuff my other hand. He takes my other hand, places it behind my back and he, he smashes my finger. I got, I got a cut. Actually I got on my hand also from the handcuff because he jerked the handcuff and smashed it onto my finger instead of on my wrist.

Appellant denied using profanity or cursing, but said he did curse when he was on the ground. Appellant further testified

that he had an injury underneath his arm, a knee injury from one of the officers, a pinched nerve in his neck from one of the officers placing his knee into appellant's neck, shoulder injuries and four or five cuts. He claimed that one of the officers hit him with a baton four or five times. He denied resisting arrest and denied that the officer ever told him why he was under arrest, or why he was being detained.

On cross-examination, appellant repeated that he threw the newspaper across the street right in front of the police car. He maintained that he was "actually throwing it to one of my buddies 'cause it was thrown over to me and we was just like playing catch." He continued, saying that he was throwing it to a friend who lived "directly across the street" and was "standing right in front of his building" and that the newspaper belonged to his friend. Appellant explained that he had been drinking "a little bit." Appellant also said that Corporal Stanley's vehicle was stopped at the light and he did not know it was a police car. He said that as soon as the light turned green, Corporal Stanley pulled up and approached him. He conceded that he had an idea why the officer might want to talk to him, but he thought that because the officer said he was not under arrest, he did not have to talk to him.

Appellant's counsel moved for a judgment of acquittal on the ground that the State failed to show that appellant failed to obey a lawful order, and since he was not disregarding a lawful order there was no right to arrest him.

Additional facts will be set forth, as needed, in our resolution of the questions presented.

## DISCUSSION

### I.—Instruction On Right To Resist Arrest

When the trial court discussed the proposed jury instructions, appellant's counsel objected to the use of the pattern instruction.[1] The following occurred:

---

1. Maryland Criminal Pattern Jury Instructions 4:27.1 sets out the pattern instruction for "Resisting Arrest (Warrantless):"

[DEFENSE COUNSEL]: (Inaudible—one word) Your Honor that I, (inaudible—one word) I had a (inaudible—one word). If you determine the Defendant was not lawfully arrested and no arrest warrant was used then the Defendant had the right to resist arrest and that's pursuant to case law. Resisting unlawful arrest is not a crime in Maryland. If an arrest is illegal the arrestee may use any reasonable means to, even for to affect [sic] his escape. And that's, that's Maryland case law.

THE COURT: The problem that you get into in this case is there's, I don't really want to have a sub-litigation issue about whether his arrest, because there, there could be four or five different things that he could have been arrested for according to the police officers. According to him, nothing. I'm gonna give the Pattern and no embellishment to— —it in this particular case.

[DEFENSE COUNSEL]: Your Honor, I'm, I'm not asking for embellishment. I would object to just a Pattern. I'm just stating that under Maryland law it is illegal [sic] to resist an illegal arrest. If the jury concludes that any of the four theories that he was legally arrested then he has no defense. But if the jury concludes that there wasn't no—a, a legal arrest, under Maryland law he has the right to resist and we have generated that instruction. I would just simply ask that that instruction be added.

THE COURT: How do you believe that you, you have generated that instruction? From the Defendant's initial, own testimony, best case he was littering. Second, he was

---

The defendant is charged with the crime of resisting arrest. In order to convict the defendant of resisting arrest, the State must prove:
 (1) that a law enforcement officer attempted to arrest the defendant;
 (2) that the defendant knew that a law enforcement officer was attempting to arrest [him] [her];
 (3) that the officer had reasonable grounds to believe that the defendant [was committing] [had committed] (crime); and
 (4) that the defendant refused to submit to the arrest and resisted the arrest by force.

acting, I, I mean, looking at it objectively the Defendant's own conduct constituted a particular offense.

The trial court refused to give appellant's requested instruction, stating two grounds: first, the court was not sure the defense was generated; second, the requested instruction was not in the pattern instructions. The trial court said it would instruct the jury that "they do have to find that there were reasonable grounds to believe that the Defendant had committed a crime for him to be guilty of that offense." The court noted counsel's objection for the record.

### The Parties' Contentions

Appellant contends that the trial court erred in "failing to instruct the jury as to the longstanding legal principle that, in Maryland, a person is privileged to offer reasonable resistance to an unlawful warrantless arrest." *See In re Albert S.,* 106 Md.App. 376, 396–97, 664 A.2d 476 (1995). He asserts that "the jury was permitted to convict only so long as it found that Corporal Stanley had—in the layperson's view—'reasonable grounds' to arrest, and was left with the mistaken impression that if Mr. Arthur did not passively acquiesce in that arrest he was guilty of resisting arrest." (Internal footnote omitted).[2]

The State counters that the pattern jury instruction sufficiently covered the area. In addition, the State asserts that the "reasonable grounds" language "properly conveys the concept of probable cause, which must be present to effect a lawful arrest." The State further contends that Corporal Stanley had probable cause to arrest appellant for "newspaper theft ... as well as other crimes, such as obstruction, second degree assault, and reckless endangerment."

---

**2.** In a footnote, appellant complains of the court's instruction that appellant was required to submit to the arrest so long as the officer had reasonable grounds—and not probable cause—to believe Mr. Arthur was engaged in criminal activity. The State asserts that this complaint is waived because appellant did not make the claim at trial. Although we agree that it was waived, our discussion will resolve that issue as well.

**Need For An Instruction**

 Maryland Rule 4–325(c) provides that "[t]he court may, and at the request of any party shall, instruct the jury as to the applicable law." When requested to do so by a party, the trial court is required to give an instruction that correctly states the applicable law if it has not been fairly covered in the instructions actually given. *State v. Martin*, 329 Md. 351, 356, 619 A.2d 992, *cert. denied*, 510 U.S. 855, 114 S.Ct. 161, 126 L.Ed.2d 122 (1993). The instruction need not be given, however, unless the requesting party has generated the issue, *i.e.*, produced "some evidence" sufficient to give rise to a jury issue on the defense.

In *Dykes v. State*, 319 Md. 206, 571 A.2d 1251 (1990), a case involving a self-defense claim, the Court of Appeals explained:

> *Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says—"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the [ ] claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden. Then the baton is passed to the State. It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not kill in self-defense.

*Id.* at 216–17, 571 A.2d 1251 (emphasis in original).

 "In evaluating whether competent evidence exists to generate the requested instruction, we view the evidence in the light most favorable to the accused." *Fleming v. State*, 373 Md. 426, 433, 818 A.2d 1117 (2003). As the Court of Appeals explained in *Dishman v. State*, 352 Md. 279, 721 A.2d 699 (1998):

> The task of this Court on review is to determine whether the criminal defendant produced that minimum threshold of

evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired.... [A] defendant charged with murder who seeks instructions on the issue of mitigation or self-defense bears the "burden of initially producing 'some evidence' . . . sufficient to give rise to a jury issue with respect to these defenses."

*Id.* at 292–93, 721 A.2d 699 (citing *State v. Evans,* 278 Md. 197, 208, 362 A.2d 629 (1976)).

We disagree with the State's assertion that there was no evidence of an unlawful arrest and therefore no reason to give the disputed instruction. If the jury believed appellant and his witnesses, they might conclude that Corporal Stanley had no reason to arrest appellant. Nonetheless, we see no error. The instruction the trial court gave followed almost exactly, with insignificant changes, Maryland Criminal Pattern Jury Instructions 4:27.1, as follows:

The second charge the Defendant is charged with is resisting a warrantless arrest. The Defendant is charged with the crime of resisting arrest. In order to convict the Defendant of [ ] resisting arrest, the State must prove each of the following elements: That a law enforcement officer attempted to arrest the Defendant; that the Defendant knew that a law enforcement officer was attempting to arrest him; *that the officer had reasonable grounds to believe that the Defendant had committed a crime* and that the Defendant refused to submit to the arrest and resisted the arrest by force.

MPJI–CR 4:27.1 (emphasis added).

It is clear from that instruction that the State was required to prove that Corporal Stanley had reasonable grounds to believe appellant had committed a crime. If the jury believed that the officer did not have reasonable grounds to arrest appellant, then it was required to find him not guilty of resisting arrest.

We agree with the State that "the 'reasonable grounds' language contained in the pattern instruction properly conveys

the concept of probable cause." The United States Supreme Court has stated that "the 'substance of all the definitions of probable cause is a reasonable ground for belief of guilt.'" *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (quoting *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). The Maryland Court of Appeals has described probable cause as "a non-technical conception of a reasonable ground for belief of guilt." *See, e.g., Haley v. State*, 398 Md. 106, 132–33, 919 A.2d 1200 (2007); *State v. Wallace*, 372 Md. 137, 148, 812 A.2d 291 (2002); *Wilkes v. State*, 364 Md. 554, 584, 774 A.2d 420 (2001).

This Court and the Court of Appeals have noted the credentials and the expertise of the pattern instructions committee and recognized the value of following the pattern instructions. In *Wills v. State*, 329 Md. 370, 383, 620 A.2d 295 (1993), referring to the Maryland Pattern Jury Instruction on reasonable doubt, the Court of Appeals stated:

> The fourteen members of the Committee which fashioned the Maryland Pattern Jury Instructions—Criminal 1991 (MPJI—CR) consisted of judges at the trial and appellate level, prosecutors and former prosecutors, defense attorneys, law professors and other distinguished members of the Maryland bar.

In *Green v. State*, 127 Md.App. 758, 771, 736 A.2d 450 (1999), this Court commented:

> [W]e say for the benefit of trial judges generally that the wise course of action is to give instructions in the form, where applicable, of our Maryland Pattern Jury Instructions. Those instructions have been put together by a group of distinguished judges and lawyers who almost amount to a "Who's Who" of the Maryland Bench and Bar. Many of these instructions have been passed upon by our appellate courts.

Indeed, appellant recognizes that "the Maryland Pattern Jury Instructions are presumed to be valid and in accordance with Maryland law." Although we have recognized that there are situations in which the pattern instruction is inadequate,

such deviations are generally owing to unusual fact patterns rather than error in the instruction. In *Rajnic v. State,* 106 Md.App. 286, 664 A.2d 432 (1995), this Court concluded that the trial court's use of the Criminal Pattern Jury Instruction on self-defense was not sufficient. We noted, however:

> Our decision here today should not be construed as a departure from the appellate policy of general adherence to the Maryland Criminal Pattern Jury Instructions. *See generally Wills v. State,* 329 Md. 370 [620 A.2d 295] (1993). Rather, our holding, that more was required than that set forth in the pattern instruction on self-defense, is limited to the particular and somewhat unique facts of the instant case.

*Id.* at 291 n. 1, 664 A.2d 432.

In the present case, appellant has not stated how this case is distinguishable from other cases in which the State must prove that a defendant resisted arrest. The pattern instruction adequately covered the concept that the arrest must be lawful. The trial court did not err in instructing the jury using the pattern instruction.

## II.—Sufficiency Of The Evidence

### The Parties' Contentions

Appellant contends that the evidence was insufficient to show that appellant failed to obey a lawful order, and, therefore, Corporal Stanley had no right to arrest him. Appellant claims that "[t]he First Amendment of the United States Constitution granted Mr. Arthur the ability to continue his expression, and forbid [sic] [Corporal] Stanley from ordering Mr. Arthur to stop speaking."

The State asserts that appellant failed to preserve the issue because appellant did not contend in the trial court that the officer could not arrest him for using objectionable language. The State further asserts that, even if preserved, appellant's contention is without merit.

## Preservation

Maryland Rule 4–324(a), which governs motions for judgments of acquittal, provides, in pertinent part:

(a) **Generally.** A defendant may move for judgment of acquittal on one or more counts, or on one or more degrees of an offense which by law is divided into degrees, at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence. The defendant shall state with particularity all reasons why the motion should be granted.

The language of the rule is mandatory. *State v. Lyles,* 308 Md. 129, 134–36, 517 A.2d 761 (1986); *Whiting v. State,* 160 Md.App. 285, 308, 863 A.2d 1017 (2004), *aff'd,* 389 Md. 334, 885 A.2d 785 (2005).

■ In the present case, appellant's counsel argued at the end of the State's case that appellant "had a right to resist," and, at the close of all evidence, argued that "the State failed to show that [appellant] . . . failed to obey a lawful order . . . and there was no right to arrest." With these statements, appellant preserved for review the question of whether Corporal Stanley's order was lawful.

## Standard Of Review

The standard for our review of the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *see also State v. Suddith,* 379 Md. 425, 429, 842 A.2d 716 (2004). In performing its fact-finding role, the trier of fact—here, the jury—decides which evidence to accept and which to reject. *See Jones v. State,* 343 Md. 448, 460, 682 A.2d 248 (1996).

Although we take the facts as the jury found them, we determine *de novo* whether there was a constitutional violation

"by reviewing the law and applying it to the facts of the case." *See State v. Collins*, 367 Md. 700, 707, 790 A.2d 660 (2002).

## Validity Of The Arrest

■ To convict appellant of resisting arrest, the State was required to prove, *inter alia*, that the arrest was lawful. *See Purnell v. State*, 375 Md. 678, 689, 827 A.2d 68 (2003); *Barnhard v. State*, 325 Md. 602, 609–10, 602 A.2d 701 (1992). Here, Corporal Stanley arrested appellant for failure to obey a lawful order to lower the volume of his voice.

Maryland Code (2002), § 10–201 of the Criminal Law Article ("CR"), prohibits "[d]isturbing the public peace and disorderly conduct," and provides, in pertinent part:

(c) *Prohibited.*— . . .

\* \* \*

(2) A person may not willfully act in a disorderly manner that disturbs the public peace.

(3) A person may not willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace.

\* \* \*

(5) A person from any location may not, by making an unreasonably loud noise, willfully disturb the peace of another:

(i) on the other's land or premises;

(ii) in a public place; or

(iii) on a public conveyance.

Appellant relies on *Downs v. State*, 278 Md. 610, 366 A.2d 41 (1976), to establish that his arrest was unlawful.[3] The Court of Appeals stated the facts of *Downs*, as follows:

---

**3.** Appellant also relies upon *Diehl v. State*, 294 Md. 466, 451 A.2d 115 (1982), to the same effect. The holding in *Diehl*, however, depended on the fact that the defendant was "acting in a lawful manner (a passenger getting out of a stopped car) and [was] the object of an unlawful police order." *Polk*, 378 Md. at 10 n. 4, 835 A.2d 575 (2003) (quoting *Diehl*, 294 Md. at 479, 451 A.2d 115). However, in the wake of *Maryland v.*

Appellant Downs was conversing with three friends while eating an early morning breakfast in a Lexington Park restaurant. In the course of the conversation Downs said in a loud voice, "All the goddamn policemen in this County are no fucking good, they're just after me." A few minutes later he loudly said, "[T]he fucking niggers in this County are no better than goddamn policemen." A uniformed State Trooper (Trooper Taylor) sitting at a table about eight feet away from the booth in which Downs and his friends were seated overheard these remarks.

The trooper went over to Downs' booth and told him that his talk was disruptive and that he would be placed under arrest if he did not refrain from using such profane language. Downs replied, "You ain't bad enough to place me under arrest," whereupon the trooper grabbed him and informed him that he was under arrest for disorderly conduct. A scuffle ensued, but Taylor finally managed to handcuff Downs.

278 Md. at 611–12, 366 A.2d 41 (internal footnote omitted). Trooper Taylor stated that he was not personally incited by the comments about police officers, but he was concerned about the effects of the racist comments in the racially mixed crowd. Downs claimed that his remarks were not directed to anyone in particular. *Id.* at 612, 366 A.2d 41.

The Court of Appeals concluded that Downs' speech was protected by the First Amendment because there was no direct evidence that he made his comments to anyone other than the persons sitting in the booth with him. The Court also pointed out that no evidence was adduced that anyone else, beside Trooper Taylor, heard this statement, or, if they did, that they were so offended by it that they were "so

*Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), which held that officers have the right to order passengers to either exit or remain in a stopped vehicle, a citizen in Diehl's position would not have been the subject of an unlawful police order. *Id.* As we explain below, the officer in the present case lawfully approached appellant and ordered him to lower his voice, and the holding from *Diehl* does not, therefore, apply to the instant case. *See Polk,* 378 Md. at 10 n. 4, 835 A.2d 575.

aroused as to respond in a violent manner." *Id.* at 618, 366 A.2d 41.

Although we agree with appellant that his language was protected speech, we disagree that Corporal Stanley arrested him based on his language. In our view, Corporal Stanley's testimony was clear that he arrested appellant because of the volume of appellant's verbalizations and not their content, and the jury accepted that testimony.

This distinction was made in *Polk v. State,* 378 Md. 1, 835 A.2d 575 (2003). There, Polk went to pick up her final paycheck at the hospital where she had worked. When she went to her employer's Human Resources Department ("Human Resources"), she was told that her paycheck was in the "Heart Center," her work site. When she went to the Heart Center, her former supervisor told her that her check was not there and to return to Human Resources. Soon after that, the supervisor found the pay check and called Hospital security to have the check delivered to Polk at Human Resources. Raymond Sperl, the security officer who responded to the supervisor's request, encountered Polk at Human Resources, and when Polk asked him about the check, he told her he had to take it to personnel. Polk responded, "Fuck you, asshole." A Human Resources employee indicated to Sperl that he could give Polk the check. Polk "snatched" it from him, repeating the expletive. As Sperl escorted Polk toward an exit, he told her to "keep your mouth quiet and leave." She again repeated the expletive. Sperl told her to "keep your mouth quiet and leave or I'm going to lock you up for disorderly conduct." *Id.* at 4, 835 A.2d 575. He told her to "keep [her] mouth shut, stop [her] cursing, [and] just leave the property." He warned her several times that "she'd be locked up [for disorderly conduct] if she didn't stop her profanity." *Id.* Two women "heard the commotion" and walked away. *Id.* As Polk left the hospital, she turned toward Sperl and shouted, "Fuck you, asshole." *Id.*

As Sperl escorted Polk toward the Hospital parking garage Polk was "yelling at him and cursing at him." *Id.* at 5, 835

A.2d 575. "When the 'vulgarity ... intensified,'" Sperl told Polk she was under arrest. *Id.* When he grabbed her shoulder, she pulled away and bit his arm. Other officers arrived and eventually subdued her. *Id.*

Polk was charged, *inter alia*, with engaging in disorderly conduct, in violation of Maryland Code (1957, 1996 Repl. Vol., 2001 Supp.), § 121(b)(3) of Article 27. *Polk,* 378 Md. at 5, 835 A.2d 575. After the State presented its case, she moved for a judgment of acquittal on all the charges, arguing that Sperl's orders to "stop cursing" "were unlawfully directed at the content of her speech and that a 'domino effect' made her subsequent arrest illegal." *Id.* She asserted that her use of profanity against the officer was protected speech and that because she had not disobeyed a lawful order, the officer had no reason to arrest her. *Id.* She claimed, therefore, that she "rightfully resisted the attempts to arrest her." *Id.* The trial court denied her motion, concluding that Sperl's orders to "quiet down" were "lawful orders to prevent a disturbance to the public peace," "directed at the volume of Polk's speech rather than its content," and that "a reasonable fact-finder could find that Polk failed to comply with the officer's order to reduce the volume of her voice." *Id.* at 5–6, 835 A.2d 575.

This Court agreed and affirmed Polk's convictions. *Id.* at 6, 835 A.2d 575. The Court of Appeals agreed that Sperl's orders were directed to the volume of Polk's voice and were reasonable and lawful orders. *Id.* at 7, 835 A.2d 575. The *Polk* Court distinguished its case from *Diehl v. State,* 294 Md. 466, 451 A.2d 115 (1982):

> Significantly, and unlike the present case, the arresting officer in *Diehl* testified that he arrested Diehl because of the *content* of his language. *Diehl,* 294 Md. at 478 [451 A.2d 115]. Corporal Sperl, on the other hand, did not testify that he arrested Polk based on the content of her language. Instead, he stated that he told Polk "just shut your mouth and leave or you're going to be locked up for disorderly conduct." This testimony supports the rational inference drawn by the trial court that the order was a

lawful attempt to prevent Polk's violation of § 121 due to her loud and disruptive behavior.

*Id.* at 13, 835 A.2d 575. The Court noted that there "was ample testimony before the trial court supporting its finding that Corporal Sperl issued orders aimed, in the main, at the volume of Ms. Polk's speech." *Id.* at 14, 835 A.2d 575.

### *Eanes v. State*

Appellant contends that the present case is more like *Diehl* and *Downs* than *Polk*. He asserts that the "the most critical point of difference between *Polk* and *Downs, Diehl,* and the present case seems to be within the context of the second *Eanes* [*v. State,* 318 Md. 436, 569 A.2d 604 (1990) ] factor, the circumstances surrounding the time and place where the speech occurred, as well as the overhearing parties' location." *See Polk,* 378 Md. at 12, 835 A.2d 575; *Eanes,* 318 Md. at 447, 569 A.2d 604. He recites that "[t]he record discloses that Corporal Stanley encountered Mr. Arthur in the milieu of a city sidewalk on the evening of the Fourth of July, a public concourse with a restaurant up the street." He likens the situs "to the public parking lot in *Diehl,* or the restaurant in *Downs,* and clearly distinguishable from the hospital in *Polk* where the majority recognized 'a compelling interest in maintaining peace and quiet in the environs of the Hospital.'" *See Polk* at 19–20, 835 A.2d 575.

*Eanes,* however, demonstrates that speech may be sufficiently loud to amount to disorderly conduct even on a public sidewalk. In that case, Eanes had gathered with others in front of a medical clinic on a public street in Hagerstown to "assemble[,] to speak out against abortion, to pass out gospel tracts [and] to try to talk to girls that are walking by [in order to explain the evils of abortion.]" *Eanes,* 318 Md. at 441, 569 A.2d 604 (alterations in original). A police officer spoke with Eanes and told him that the police had received a number of noise complaints and requested that the group lower its volume. *Id.* at 441–42, 569 A.2d 604. The officer left, but he returned forty minutes later in response to further complaints and arrested Eanes for disturbing the peace. *Id.* at 442, 569

A.2d 604. The District Court found Eanes guilty of disturbing the peace, and, at a trial *de novo*, the circuit court found Eanes "guilty of willfully disturbing the peace and tranquility of that particular neighborhood ... by making loud and otherwise unacceptable[,] improper under the circumstances noises." *Id.* at 443, 569 A.2d 604 (alteration in original).

The Court of Appeals discussed several United States Supreme Court decisions regarding statutory restrictions on speech and noted that the level of scrutiny depends on "whether the statute distinguished between prohibited and permitted speech on the basis of content." *Id.* at 447, 569 A.2d 604 (quoting *Frisby v. Schultz*, 487 U.S. 474, 481, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988)). The Court explained:

> A content-based restriction is constitutionally hale only if it can be shown that the challenged " 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end....' " [*Frisby* ] (quoting *Perry* [*Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) ]....) On the other hand, a state " 'may ... enforce regulations of the time, place and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.' " *Frisby*, 487 U.S. at 482 [108 S.Ct. 2495] (quoting *Perry*, 460 U.S. at 45 [103 S.Ct. 948] ).

*Eanes*, 318 Md. at 447–48, 569 A.2d 604.

The Court of Appeals held that the State did not violate Eanes' First Amendment rights. The court recognized that " '[I]f one of the proposed interpretations would render an enactment valid, while another would render it invalid or ineffective, the court will construe the enactment to be valid whenever feasible,' " *Eanes*, 318 Md. at 448, 569 A.2d 604 (quoting *City of College Park v. Cotter*, 309 Md. 573, 589, 525 A.2d 1059 (1987)), and therefore construed the phrase "loud and unseemly noise" "in a content-neutral fashion in order to remain in conformity with first amendment jurisprudence." The court construed the statute to mean that § 121 could be

enforced "only if the speech is unreasonably loud under the circumstances," and, thus, content-neutral. *Id.* at 449, 569 A.2d 604. Quoting from *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), the Court noted that " 'it can no longer be doubted that government has a substantial interest in protecting its citizens from unwelcome noise.' " *Eanes*, 318 Md. at 450, 569 A.2d 604 (quoting *Ward*, 491 U.S. at 796, 109 S.Ct. 2746 (internal citations, quotation marks, and brackets omitted)). The Court further noted that numerous Supreme Court cases "reflect judicial concern with balancing the right of free speech with the individual's right to be free from unwanted communication." *Id.* at 450, 569 A.2d 604. The Court then concluded:

> We read the statute as going no further than to afford content-neutral protection to the captive auditor (on the facts before us, auditors in homes or in private offices) who cannot avoid continuing, unreasonably loud and disruptive communications emanating from the street. So read, the statute serves a substantial interest and is narrowly tailored to serve those ends.

*Id.* at 453–54, 569 A.2d 604.

### This Case

Although CR § 10–201 is worded differently from Art. 27, § 121, it is clear that it also affords content neutral protection to the captive auditor. In the present case, Corporal Stanley testified that when he approached appellant, appellant began yelling obscenities at him, and he told appellant to settle down.[4] He further testified that when he and appellant neared the Old Town Tavern, people outside the doors of the tavern stood and watched them. Corporal Stanley said that he told appellant to "lower his voice, to settle down, and [appellant] continued to refuse." He later testified that appel-

---

**4.** Taking the evidence in a light most favorable to the prosecution, Corporal Stanley approached lawfully because he reasonably suspected that appellant had thrown an object into traffic and, in doing so, struck Corporal Stanley's vehicle.

lant "became disorderly, yelling . . . drawing the attention of the people in front of the bar, screaming obscenities."

Further, the record reveals that the incident occurred late at night, and, from appellant's testimony that his "buddy" lived directly across the street, the area was at least partly residential. The individuals in their homes were entitled to be free from unreasonably loud noise. A rational jury could find that Corporal Stanley's order that appellant lower his voice was content-neutral and was based on the volume of appellant's voice. The jury could also find that the order was reasonable, that it was intended to prevent a disturbance to the public peace, and that appellant disobeyed it. Because the officer had a right to arrest appellant for committing the offense in his presence,[5] the jury could find that appellant resisted a lawful arrest and, therefore, was guilty of the offense of resisting arrest.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

**5.** Maryland Code (2001, 2008 Repl. Vol.), § 2–202 of the Criminal Procedure Article, entitled "Warrantless arrests—In general," provides:

(a) *Crimes committed in presence of police officer.*—A police officer may arrest without a warrant a person who commits or attempts to commit a felony or misdemeanor in the presence or within the view of the police officer.

(b) *Probable cause to believe crime committed in presence of officer.*—A police officer who has probable cause to believe that a felony or misdemeanor is being committed in the presence or within the view of the police officer may arrest without a warrant any person whom the police officer reasonably believes to have committed the crime.

(c) *Probable cause to believe felony committed.*—A police officer without a warrant may arrest a person if the police officer has probable cause to believe that a felony has been committed or attempted and the person has committed or attempted to commit the felony whether or not in the presence or within the view of the police officer.