4 A.3d 32

**Raymond Charles LUPFER**

v.

**STATE of Maryland.**

**No. 1046, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Sept. 3, 2010.

Marc A. DeSimone, Jr. (Elizabeth L. Julian, Acting Public Defender, on the brief) Baltimore, MD, for appellant.

Jeremy M. McCoy (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: EYLER, DEBORAH S., WRIGHT and GRAEFF, JJ.

GRAEFF, J.

A jury sitting in the Circuit Court for Cecil County convicted appellant, Raymond Charles Lupfer, of second degree murder, first degree assault, and use of a handgun in the commission of a felony. The court imposed a sentence of 30 years for the conviction of second degree murder and ten years consecutive for the conviction of use of a handgun in the commission of a felony.[1]

Appellant presents two issues for our review, which we have reworded as follows:

1. Did the trial court err in allowing the State to elicit evidence of appellant's post-arrest, post-*Miranda* [2] silence and his request to speak to an attorney in order to rebut the impression created by the defense that appellant actively cooperated with the police?

2. Did the trial court abuse its discretion in responding to appellant's claim that several State witnesses violated the court's sequestration order?

---

1. The first degree assault conviction merged with the second degree murder conviction.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

For the reasons set forth below, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On the evening of June 16, 2007, appellant shot Jeremy Elijah Yarbray. Mr. Yarbray collapsed and died in the parking area outside the residence at 159 Mahogany Drive in Cecil County, Maryland. When the police discovered Mr. Yarbray's body, a bag of cocaine was found in his hand. There was no dispute that appellant shot the victim, but the testimony differed regarding the events leading up to the shooting.

The residence at 159 Mahogany Drive was rented by Kate Archibald. She lived there with her daughter, her friend, Mary Jenna Webb, Ms. Webb's boyfriend, Jesse Kennedy, and Ms. Webb's two sons.

Mr. Kennedy testified that, on the evening of June 16, 2007, Derek Patton, appellant, and Matthew Jackson came to the residence. Appellant, who Mr. Kennedy had met a week or two earlier, wanted to buy cocaine. Mr. Kennedy made a call in an attempt to purchase drugs.[3] A short time later, Mr. Yarbray arrived at the residence and spoke with appellant about a bag of drugs.

Mr. Kennedy testified that appellant and Mr. Yarbray began to argue, and a "scuffle" ensued. Appellant produced a handgun from his waistband, and he hit Mr. Yarbray two or three times in the face with the gun. Mr. Kennedy told appellant to let Mr. Yarbray go, and Mr. Yarbray eventually crawled out the front door and stumbled down the steps. Appellant opened the door and fired four or five shots at Mr. Yarbray. After the shooting, Mr. Kennedy went to the front door and saw "blood all over [the] porch" and sidewalk, and Mr. Yarbray was in the road "lying face down not moving."

---

**3.** There was some dispute regarding who arranged the cocaine delivery, but it was agreed that a call was made and Mr. Yarbray arrived shortly thereafter.

Derek Patton testified that, on the day of the shooting, he drove appellant and Mr. Jackson to Ms. Webb's residence. Mr. Kennedy made a phone call, and approximately 15 minutes later, the victim arrived at the residence. Appellant, who had been in the bathroom, exited the bathroom and stated to Mr. Yarbray: "[D]o you remember me[?]" Appellant then punched Mr. Yarbray in the face, and a fight ensued. Mr. Patton "broke up the fight" because both the victim and appellant "were going for" a gun on the floor. The victim then moved toward the door to leave the residence. Mr. Patton heard a shot and saw the victim fall, but he did not see who shot the victim. After the shooting, Mr. Patton ran from the residence.

Matthew Jackson testified that, on the evening of the shooting, he went with appellant and Mr. Patton to Mr. Kennedy's residence to purchase some cocaine. At the residence, Mr. Kennedy "called somebody." When Mr. Yarbray arrived a few minutes later, appellant was in the bathroom. He came out of the bathroom "with a gun in his hand," and he pointed it at Mr. Yarbray. Appellant stated: "Do you remember me?" Mr. Yarbray "pushed his hands up in the air," and Mr. Jackson then ran out the back door. He "heard a couple of shots," but he kept running.

Several witnesses outside the residence testified to their observations. Gene Salisbury, a neighbor, testified that he saw "a guy fly out from about five doors up from me," and he "heard two rounds of a heavy-caliber gun go off." [4] Another neighbor, age 14, testified that he saw appellant come out of the house "shooting the guy."

Robert Lloyd testified that he was driving to Charlestown with Mr. Yarbray, and Mr. Yarbray asked him to "stop by" the Mahogany Drive residence. Mr. Lloyd remained in the car. He observed Mr. Yarbray exit the house and fall down. He then saw a man exit the house and shoot Mr. Yarbray, but

---

**4.** Mr. Salisbury's name appears in the record as "Salsbery" and "Salisbury." To avoid confusion, we shall use "Salisbury" throughout this opinion.

he did not see his face. Mr. Lloyd drove away, and he did not report the shooting. He subsequently advised the police, however, that based on a photograph that appeared in a newspaper, he thought that appellant was the shooter.

John Hardiman testified that, on June 18, 2007, two days after the shooting, while taking his dog for a walk, he discovered a handgun under his truck. He called 911 and advised the police. Mr. Hardiman identified the gun in the State's custody as the same gun he discovered under his truck.

Troy McDonough, a Corporal assigned to the Homicide Unit with the Maryland State Police, responded to Mr. Hardiman's residence and took custody of the gun. He observed "dried blood on the trigger guard. . . ." Forensic analysis showed that appellant's DNA matched the DNA profile obtained from the hand grip and trigger guard of the gun.

Joshua Jackson, a commercial driver, testified that, the day after the shooting, he encountered appellant at a gas station in New Jersey along his route. Appellant stated that he was waiting for his wife, and he asked to use Mr. Jackson's cell phone. Appellant advised that "he was getting away from a situation that he had hurt somebody." When Ms. Hamilton arrived, Mr. Jackson gave them a ride to a truck stop in Maryland, where they waited in Mr. Jackson's truck for their ride to pick them up. Mr. Jackson fell asleep; he woke up when several police officers ordered Mr. Jackson, appellant, and Ms. Hamilton out of the truck.

Mary Ripple, a medical doctor with the Office of the Chief Medical Examiner, testified as an expert in forensic pathology. Based on the autopsy that she performed, she determined that Mr. Yarbray's death was a homicide, and he died from "multiple gunshot wounds, and blunt force injury. . . ." Mr. Yarbray suffered one or two gunshot wounds to his upper body and two to his left thigh.[5] Dr. Ripple concluded that, based on the

5. Dr. Ripple could not determine whether the victim suffered one or two gunshots to his upper body. She explained that she believed that it

absence of "stippling" around the gunshot wounds, the gun was not fired from "close-range." Dr. Ripple located a bullet during the autopsy, which was provided to law enforcement.

Mike Nickol, an employee with the Forensic Science Division of the Maryland State Police, testified as an expert in firearms and tool marks examination. He concluded that the bullet recovered from the victim's right arm was fired from the handgun the police recovered. He further concluded that the shell casing recovered from behind the residence was fired from the same gun.

After the State rested, appellant moved for judgment of acquittal on the charge of first-degree murder, arguing that there was no evidence that the shooting was premeditated or committed with the specific intent to kill. The court denied appellant's motion.

Appellant then presented his case. Pamela Hamilton testified that she was romantically involved with appellant. The morning after the shooting, appellant called Ms. Hamilton and asked her to pick him up in New Jersey, stating that he wanted to turn himself in to the police. On her way to New Jersey, Ms. Hamilton experienced car problems, but she eventually arrived at the truck stop where appellant was waiting. Appellant advised her that he "didn't do anything wrong," and "it did not happen the way people think that it happened." They rode with a truck driver back to Maryland. While waiting for a ride at a truck stop in North East, the police arrived; they arrested appellant and took Ms. Hamilton into custody.

Appellant testified that, on the night of the shooting, he came out of the bathroom at Mr. Kennedy's residence and saw Mr. Patton fighting with Mr. Yarbray. He saw a handgun in the middle of the floor, and he tried to pick it up so the other men would not use it in the fight. Appellant and Mr. Yarbray grabbed the gun at the same time, and the gun accidently

---

was "all one continuous shot going" through his body, but it "could be two shots."

discharged three times. Appellant testified that he did not intend to pull the trigger. After Mr. Yarbray let go of the gun, appellant fired one bullet at the ground. Mr. Yarbray fell on the ground outside the house, and appellant walked out and "looked because [he] was just in shock." Appellant then ran from the house and threw the gun in the woods.

After he fled from the crime scene, a co-worker drove appellant to a truck stop in New Jersey. The co-worker gave appellant some work clothes because there was blood on his clothing. Appellant remained at the truck stop through the night, and the next morning, he called Ms. Hamilton. Appellant asked Ms. Hamilton to bring him back to Maryland "[b]ecause [he] had time to think about what was going on and [he] needed to come to Maryland." Appellant testified that he intended to turn himself in and "get the situation straightened out."

Ms. Hamilton arrived at the truck stop in New Jersey in the afternoon. Appellant told her that "it didn't happen like I'm sure everybody is saying it happened." He testified that they were going to drive back to Maryland, where he intended to go to Ms. Hamilton's mother's house "[b]ecause [he] had been up for almost two days and [he] wasn't prepared mentally or physically to deal with going to turn myself in instantly." Appellant's plan was to "[t]ry to get some sleep and prepare to go talk to the police." Appellant and Ms. Hamilton rode with a truck driver back to Maryland, and while waiting for a ride at a truck stop in Maryland, the police arrived and arrested appellant.

At the conclusion of all the evidence, counsel for appellant moved for judgment of acquittal, arguing that there was insufficient evidence of premeditation to support the charge of first-degree murder. The court denied appellant's motion.

On April 7, 2008, the jury began deliberations. Later that day, the jury returned a verdict, finding appellant not guilty of first degree murder, but finding him guilty of second degree

murder, first degree assault, and use of a handgun in the commission of a felony.

This timely appeal followed.

## DISCUSSION

### I.

Appellant contends that "the trial court erred in allowing the State to introduce evidence that, when questioned after being arrested, Mr. Lupfer remained silent and asked to speak with an attorney." He asserts that this was error for two reasons. First, he argues that, although his testimony that he intended to speak with the police may have permitted the admission of this evidence "as a matter of constitutional law," the Maryland appellate courts "have uniformly held," pursuant to "Maryland state-law principles," that a defendant's silence "after arrest, may never be introduced against the accused." Second, appellant asserts that, even if his testimony that he intended to give the police a statement opened the door to admit evidence of his failure to give a statement, it "was limited solely to the fact that [he] did not give a statement to the police." He contends that "there is no justification for allowing the State to introduce the fact that [he] invoked the assistance of counsel when questioned...."

The State contends that "the trial court properly exercised its discretion in allowing the State's use of Lupfer's post-*Miranda* silence," arguing that the evidence was "in fair response" to appellant's "testimony that he fully intended to cooperate with police, turn himself in, and explain his side of the story regarding his claim that the shooting was an accident." With respect to appellant's claim that the court erred in admitting evidence that he asked to speak to an attorney, the State argues that this contention is not preserved for appellate review. Even if preserved, however, the State argues that the evidence was properly admitted "to fairly respond and rebut his claim that he had every intention of fully cooperating with the police."

## A.

### Proceedings Below

Appellant testified that, immediately after the shooting, he fled to New Jersey. He first testified, however, that he returned to Maryland the next day to "go talk to the police." Before he was able to contact the police voluntarily, they arrested him at the truck stop.

After appellant's direct examination, the prosecutor approached the bench and proffered as follows:

Your Honor, among other things that this defendant has said in the course of his testimony is that he intended to speak to police. In fact, after he was arrested he was questioned and he elected not to say anything to police. Ordinarily I could not comment upon that, but it appears to me that when a defendant such as Mr. Lupfer gives testimony that he intended to speak to police, even as he was in New Jersey according to his testimony, deliberating about the issue of turning himself in, I believe that he has now opened the door to that cross-examination. Before I go there, I just wanted to bring that matter to the bench.

Defense counsel disagreed with the argument that appellant was subject to cross-examination regarding his post-arrest silence, stating as follows:

I don't think that he is. And the reason is because Mr. Lupfer originally did not think that there was going to be a serious charge such as murder brought against him. And when the police arrested him and told him that, he said, Oh, shit, this is more serious than I thought.... I better talk to my attorney.

The court ruled that the prosecutor could "bring that out," stating: "I think the door has been opened."

On cross-examination, the prosecutor questioned appellant about why he wanted to come back to Maryland and the following occurred:

[APPELLANT]: I told [Ms. Hamilton] it didn't happen like I'm sure everybody is saying it happened.

[PROSECUTOR]: That's all you told her?

[APPELLANT]: Yes.

[PROSECUTOR]: Why?

[APPELLANT]: Why would I—I don't know why. I can't—I don't know why.

[PROSECUTOR]: Well, you say that when you were up there—

[APPELLANT]: Yes.

[PROSECUTOR]:—thinking about coming back to Cecil County, that you were coming back to Cecil County because you wanted to turn yourself in.

[APPELLANT]: Yes.

[PROSECUTOR]: You wanted to talk to the police, right?

[APPELLANT]: I wanted to get the situation straightened out.

[PROSECUTOR]: You wanted to try to clear yourself, right?

[APPELLANT]: I wanted to get the situation—I'm not sure of my intentions, but running was not my intention. It was just going to get worse and I knew that there is only one person that is going to say what needs to be said, and that was me.

The prosecutor then questioned appellant regarding what occurred after he was arrested. As set forth in more detail, *infra,* appellant testified that, "[b]efore they slid the charges charging me with first degree murder," the police "did not give me a chance to say anything. And when I seen the charges, I asked for a lawyer."

The State then called Sergeant David Sexton as a rebuttal witness. The prosecutor asked Sergeant Sexton about his efforts to question appellant following his arrest, and Sergeant Sexton testified: "I read him his advice of rights and he elected not to answer any questions. He said he would have to talk to a lawyer because those charges were very serious and he wanted to speak to a lawyer."

## B.

### Standard of Review

 Generally, we "review a trial court's ruling on the admissibility of evidence under the abuse of discretion standard." *Prince George's County v. Longtin,* 190 Md.App. 97, 133, 988 A.2d 20, *cert. granted,* 414 Md. 330, 995 A.2d 296 (2010). When the admission of evidence involves a possible violation of a constitutional right, however, "this Court conducts its own independent constitutional analysis." *State v. Davis,* 415 Md. 22, 29, 997 A.2d 780 (2010). *Accord Arthur v. State,* 193 Md.App. 446, 460–61, 997 A.2d 899 (2010) ("[W]e determine *de novo* whether there was a constitutional violation 'by reviewing the law and applying it to the facts of the case.'") (quoting *State v. Collins,* 367 Md. 700, 707, 790 A.2d 660 (2002)).

## C.

### Post–Arrest, Post-*Miranda* Silence

 The Fifth Amendment to the United States Constitution guarantees a person accused of a crime the right to remain silent. *See* U.S. CONST. amend. V ("No person ... shall be compelled in any criminal case to be a witness against himself...."). The Fifth Amendment is applicable to the States pursuant to the Fourteenth Amendment. *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

██ The admissibility in a criminal trial of a defendant's silence has been the subject of numerous cases. The analysis is different depending on the time when the silence occurred, and the State's purpose in eliciting the evidence. *See Grier v. State,* 351 Md. 241, 252–60, 718 A.2d 211 (1998) (discussing analysis for admission of evidence regarding pre-arrest silence; post-arrest, pre-*Miranda* silence; and post-arrest, post-*Miranda* silence). This case involves the admissibility of appellant's post-arrest, post-*Miranda* silence.

As appellant notes, the Court of Appeals in *Grier*, 351 Md. at 258, 718 A.2d 211, stated that post-arrest, post-*Miranda* silence "is inadmissible for any purpose." In making that statement, however, the Court cited to United States Supreme Court cases that held that post-arrest silence was inadmissible as **substantive evidence of guilt** or to **impeach an affirmative defense** at trial. *See Miranda*, 384 U.S. at 468 n. 37, 86 S.Ct. 1602 ("[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation."); *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (silence after receipt of *Miranda* warnings is inadmissible to impeach an affirmative defense raised at trial). *See also Griffin*, 380 U.S. at 615, 85 S.Ct. 1229 (where defendant does not testify at trial, the Fifth Amendment precludes the government from using a defendant's post-arrest silence as substantive evidence of consciousness of guilt).

As explained below, the Court of Appeals did not hold that post-*Miranda* silence was inadmissible in the situation where it is offered for a purpose other than as substantive evidence of guilt or to impeach an affirmative defense. Rather, the Court in *Grier* left that question open. We will address that issue in this case.

We begin our analysis with *Doyle*, wherein the Supreme Court addressed whether it was permissible for the State to impeach a defendant's affirmative defense at trial with his post-*Miranda* silence. In that case, the prosecutor cross-examined two defendants, who had remained silent after being advised of their *Miranda* rights, regarding why they had not told the police, as they testified at trial, that someone framed them. *Doyle*, 426 U.S. at 611, 613, 96 S.Ct. 2240. In holding this was error, the Court characterized silence after *Miranda* warnings as "insolubly ambiguous because of what the State is required to advise the person arrested." *Id.* at 617, 96 S.Ct. 2240. It explained that, "while it is true that the *Miranda* warnings contain no express assurance that silence will carry

no penalty, such assurance is implicit to any person who receives the warnings," and "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618, 96 S.Ct. 2240.[6]

The Supreme Court recognized, however, that the State is not prohibited from commenting on a defendant's post-*Miranda* silence in all cases. There are circumstances where a claim raised by the defense may justify reference to the defendant's post-*Miranda* silence.

In *Doyle,* the Court recognized an exception to the general rule of inadmissibility of post-arrest, post-*Miranda* silence:

> It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. *Cf. United States v. Fairchild,* 505 F.2d 1378, 1383 (C.A.5 1975).

*Id.* at 620 n. 11, 96 S.Ct. 2240. This exception has been explained as follows:

> [I]f a defendant provided alibi testimony during trial, and further testified on direct examination that he *told* the police the same alibi during custodial interrogation, when, in fact, the defendant had exercised his right to remain silent during custodial interrogation, then such evidence of post-arrest, post-*Miranda* silence is likely admissible for the State's limited purpose to respond to the defendant's testimony.

---

6. The Due Process Clause of the Fourteenth Amendment provides: "No State shall ... deprive any person of life, liberty, or property, without due process of law...." U.S. CONST. amend. XIV, § 1.

ANDREW V. JEZIC, FRANK MOLONY, WILLIAM E. NOLAN & HON. PATRICK L. WOODWARD, MARYLAND LAW ON CONFESSIONS § 19.5, at 759 (2009–2010 ed.).

The Supreme Court subsequently addressed another situation where reference to a defendant's post-arrest silence was permissible as "a fair response to a claim made by defendant or his counsel." *United States v. Robinson*, 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988). In *Robinson*, defense counsel stated in closing argument that "the Government had unfairly denied respondent the opportunity to explain his actions." *Id.* at 27, 108 S.Ct. 864. The prosecutor advised the jury during his closing argument that Robinson, who did not testify at trial, " 'could have taken the stand and explained it to you....' " *Id.* at 26, 108 S.Ct. 864. The Supreme Court held that the prosecutor's comment did not violate Robinson's Fifth Amendment right against compulsory self-incrimination. *Id.* at 31–32, 108 S.Ct. 864. The Court noted that "the prosecutorial comment did not treat the defendant's silence as substantive evidence of guilt, but instead referred to the possibility of testifying as one of several opportunities which the defendant was afforded, contrary to the statement of his counsel, to explain his side of the case." *Id.* at 32, 108 S.Ct. 864.

The Court explained why the prosecutor's comments did not violate Robinson's privilege against self-incrimination:

"[The] central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence...." To this end it is important that both the defendant and the prosecutor have the opportunity to meet fairly the evidence and arguments of one another. The broad dicta in *Griffin* to the effect that the Fifth Amendment "forbids ... comment by the prosecution on the accused's silence," must be taken in the light of the facts of that case. It is one thing to hold, as we did in [*Griffin*], that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as defendant does here, that the same reasoning would forbid the prosecutor from fairly responding to an

argument of the defendant by adverting to that silence. There may be some "cost" to the defendant in having remained silent in each situation, but we decline to expand *Griffin* to preclude a fair response by the prosecutor in situations such as the present one.

*Id.* at 33–34, 108 S.Ct. 864 (citations omitted).

In *People v. Austin,* 23 Cal.App.4th 1596, 28 Cal.Rptr.2d 885 (1994), *overruled on other grounds by People v. Palmer,* 24 Cal.4th 856, 103 Cal.Rptr.2d 13, 15 P.3d 234 (2001), the Court of Appeal of California considered the "fair response" doctrine. In that case, defense counsel's questions to the officer who arrested Austin attempted to create an inference that Austin had not been permitted the opportunity to explain a damaging admission. *Id.* at 1610, 28 Cal.Rptr.2d 885. On redirect examination, the prosecutor asked the officer if, after advising Austin of his *Miranda* rights, he gave Austin the opportunity to make a full statement. *Id.* at 1610–11, 28 Cal.Rptr.2d 885. The officer replied that he had given Austin that opportunity, but Austin declined to make a statement. *Id.* at 1611, 28 Cal.Rptr.2d 885.

The California court noted that the Supreme Court cases *Griffin* and *Doyle* stood "for the principle it is fundamentally unfair for the state to afford defendants the right to remain silent and then use that silence against them." *Id.* at 1611–12, 28 Cal.Rptr.2d 885. The court noted, however, that "the defendant's right to remain silent is a shield. It cannot be used as a sword to cut off the prosecution's 'fair response' to the evidence or argument of the defendant." *Id.* at 1612, 28 Cal.Rptr.2d 885 (citing *Robinson,* 485 U.S. at 32, 108 S.Ct. 864).

Finding no error with the prosecutor's questions regarding Austin's post-*Miranda* silence, the court stated:

Austin sought to create the impression in the jurors' minds [that] the police had treated him unfairly by not giving him the opportunity to explain his damaging statement to Deputy Hartman and to use the fact he had invoked his right to remain silent to prevent the prosecutor from countering this

impression. The Fifth Amendment protects defendant's right to remain silent. It does not protect his effort to exploit his silence by requiring the government also remain silent. Here, the prosecutor's purpose on redirect examination of Deputy Hartman was to correct the impression created on cross-examination Austin had not been afforded an opportunity to explain the apparently damaging statement he made to Hartman. There was no attempt to suggest defendant's invocation of his right to remain silent was substantive evidence of guilt nor to impeach a defense by bringing out Austin's postarrest silence. The rationale of *Griffin* and *Doyle* is inapplicable.

*Id.* at 1612–13, 28 Cal.Rptr.2d 885.

Another scenario in which courts have held that a prosecutor properly may question a criminal defendant about post-*Miranda* silence, a situation relevant to what occurred in this case, is where the defendant's silence is introduced for the limited purpose of rebutting an impression created by the defendant that he cooperated fully with the police. For example, in *Fairchild,* 505 F.2d at 1381, a case cited with approval by the Supreme Court in *Doyle,* the United States Court of Appeals for the Fifth Circuit noted that post-*Miranda* silence is "excluded for the purpose of protecting certain rights of the defendant. It is not excluded so that the defendant may freely and falsely create the impression that he has cooperated with the police when, in fact, he has not." *Id.* at 1383.

In *Fairchild,* defense counsel established that Fairchild had voluntarily provided handwriting samples, and he attempted to create the impression that Fairchild had cooperated with the police when he asked: " 'During the period of time that this investigation has been going on, to your knowledge has Mr. Fairchild cooperated fully with the FBI and U.S. Attorney's office in responding with anything that you all wanted?' " *Id.* The court stated: "Assuming the law would have excluded from evidence Fairchild's silence had he not broached the subject of cooperation, once he did broach it the bar was lowered and he discarded the shield which the law had created

to protect him." *Id.* Noting that a criminal defendant may waive his constitutional rights by his conduct, the court held that evidence of his post-*Miranda* silence "was admissible for the purpose of rebutting the impression which he attempted to create: that he cooperated fully with the law enforcement authorities." [7] *Id.*

Other courts similarly have held that evidence of a defendant's post-*Miranda* silence is admissible to rebut an impression created by the defense that he or she cooperated with the police. For example, in *United States v. O'Keefe*, 461 F.3d 1338, 1349 (11th Cir.2006), *cert. denied*, 549 U.S. 1232, 127 S.Ct. 1308, 167 L.Ed.2d 120 (2007), the United States Court of Appeals for the Eleventh Circuit held that "evidence of, and argument referring to, O'Keefe's post-*Miranda* silence was admissible for the purpose of rebutting the impression which he attempted to create: that he cooperated fully with the law enforcement authorities." The court stated: " 'When a defendant attempts to convince a jury that he was of a cooperative spirit, *Doyle* does not tie the hands of prosecutors who attempt to rebut this presentation by pointing to a lack of cooperation.' " *Id.* at 1348 (quoting *United States v. Reveles*, 190 F.3d 678, 685 (5th Cir.1999)).

The United States Court of Appeals for the Seventh Circuit has also recognized this exception to the general rule that post-*Miranda* silence is inadmissible. In *United States v. Shue*, 766 F.2d 1122, 1129 (7th Cir.1985), the court stated that, where a defendant creates an impression of general cooperation with the police after arrest, a court may allow the prosecutor to elicit evidence of the defendant's post-arrest silence to rebut the impression of full cooperation. The court stated: "A defendant should not be permitted to twist his *Miranda* protection to shield lies or false impressions from

---

7. The court stated that, although the exercise of a constitutional privilege to remain silent, in the abstract, may not be considered a lack of cooperation, it does refute an inference of active cooperation with the police. *United States v. Fairchild*, 505 F.2d 1378, 1383 n. 8 (5th Cir.1975).

government attack." *Id.*[8] *Accord Earnest v. Dorsey,* 87 F.3d 1123, 1135 (10th Cir.) ("reference to post-arrest silence is permissible for rebuttal purposes when a defendant implies that he cooperated with the police") (citations omitted), *cert. denied,* 519 U.S. 1016, 117 S.Ct. 527, 136 L.Ed.2d 414 (1996). *See also State v. McIntosh,* 358 S.C. 432, 595 S.E.2d 484, 491 (2004) (agreeing with principle that a defendant may open the door to evidence of post-*Miranda* silence by creating the impression that he cooperated with the police, but finding no assertion of cooperation in that case); *State v. Cockrell,* 306 Wis.2d 52, 741 N.W.2d 267, 274 (App.) (recognizing that evidence that Cockrell cooperated with the police permitted the State to elicit that Cockrell declined to answer questions after his arrest), *review denied,* 306 Wis.2d 46, 744 N.W.2d 295 (2007).

Here, appellant testified that, although he fled to New Jersey after the shooting, he returned to Maryland to turn himself in to the police. On cross-examination, before being questioned regarding his actions after arrest, appellant testified that he wanted to talk to the police "to get the situation straightened out," stating that he "knew that there was only one person that is going to say what needs to be said, and that was me." This testimony created the impression that appellant was cooperating fully with the police. Pursuant to the above authorities, it was not fundamentally unfair for the State to rebut this impression of cooperation and elicit evidence that appellant subsequently declined to talk with the police.

Appellant does not appear to disagree with this conclusion; he does not attempt to distinguish the above authority or otherwise argue that it was unconstitutional for the State to

---

**8.** In that case, however, the prosecutor did not limit the use of the defendant's post-*Miranda* silence to "the permissible use of impeaching appellant's credibility regarding his cooperation or lack thereof." *United States v. Shue,* 766 F.2d 1122, 1130 (7th Cir.1985). Rather, the prosecutor argued that the defendant's silence "was inconsistent with his claim of innocence," an argument that violated the dictates of *Miranda. Id.* at 1132.

elicit evidence of his post-*Miranda* silence under the circumstances of this case. Instead, he relies on state law, arguing that "[t]he Maryland Declaration of Rights affords greater protections to the accused than the Fifth Amendment and, as a matter of Maryland law, evidence of the accused's post-arrest silence is never admissible." [9]

■ The Fifth Amendment to the United States Constitution and Article 22 of the Maryland Declaration of Rights both protect the privilege against self-incrimination. *Adkins v. State*, 316 Md. 1, 6, 557 A.2d 203 (1989). Although "to some extent, Maryland self-incrimination law grants greater protections to the individual than the Fifth Amendment," the Court of Appeals has made clear that "the privilege against self-incrimination protected by Article 22 of the Maryland Declaration of Rights *'generally'* is *'in pari materia'* with the Self–Incrimination Clause of the Fifth Amendment." *Marshall v. State*, 415 Md. 248, 259, 259 n. 4, 999 A.2d 1029 (2010).

■ Here, although appellant states generally that Article 22 of the Maryland Declaration of Rights has been construed more broadly than the Fifth Amendment in some instances, he has made no specific argument why this Court should construe the State constitution more broadly than the Fifth Amendment in regard to the issue presented in this case, *i.e.*, the constitutionality of admitting evidence of post-*Miranda* silence to rebut the impression created by the defense that the defendant cooperated fully with the police. Accordingly, we will not address this issue. *See Klauenberg v. State*, 355 Md. 528, 552, 735 A.2d 1061 (1999) ("arguments not presented in a brief or not presented with particularity will not be considered on appeal"); *Hopkins v. Silber*, 141 Md. App. 319, 338, 785 A.2d 806 (2001) (same).[10]

---

**9.** Article 22 of the Maryland Declaration of Rights provides that "[t]hat no man ought to be compelled to give evidence against himself in a criminal case." Mɒ. Dᴇᴄʟ. Rɪɢʜᴛs, art. 24.

**10.** Moreover, it does not appear that the Fifth Amendment or Article 22 is the pertinent constitutional provision to be addressed in this case. In

Appellant's primary argument with respect to Maryland law is based on "State evidentiary law." He cites *Wills v. State*, 82 Md.App. 669, 677, 573 A.2d 80 (1990), for the proposition that "evidence of an accused's post-arrest, pre-*Miranda* warning, silence for impeachment is inadmissible because the probative value, if any, of such evidence, is clearly outweighed by its potential for unfair prejudice." In *Wills*, the Court stated that

> knowledge of the right to remain silent is widespread and it is likely that an accused's silence—even where *Miranda* warnings have not been administered—is merely an invocation of the right. Therefore, since "[s]ilence may be motivated by many factors other than a sense of guilt or lack of an exculpatory story," it carries little, if any, probative value.

*Id.* at 678, 573 A.2d 80 (citation omitted).

In the present case, appellant's post-arrest, post-*Miranda* silence was not admitted to show appellant's "sense of guilt or lack of an exculpatory story." Rather, it was used to rebut the impression created by appellant that he cooperated with the police. The prosecutor merely cross-examined appellant regarding whether he had the opportunity to give his version of the events to the police, as he testified he intended to do. Appellant testified that the police did not give him a chance to explain what happened before they gave him the charging document, at which time he asked for a lawyer. In response to appellant's testimony, the State called Sergeant Sexton as a rebuttal witness to explain that appellant was advised of the charges and then given the opportunity to make a statement, which opportunity appellant declined. The clear purpose of

*Jenkins v. Anderson*, 447 U.S. 231, 235, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Supreme Court stated that, when a defendant testifies in his or her own defense, there is no violation of the Fifth Amendment if the prosecutor uses the defendant's silence as impeachment evidence. The admissibility of evidence of post-arrest silence for purposes of impeachment is analyzed under the Due Process Clause of the Fourteenth Amendment. *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

this evidence was to rebut appellant's attempt to create the impression that he was actively cooperating with the police.[11] Although post-*Miranda* silence may not be probative as substantive evidence of guilt or to impeach an affirmative defense, it was probative on an issue generated by the defense case in this case, whether appellant actively cooperated with the police.

Appellant contends, however, citing to language in *Grier*, 351 Md. at 258, 718 A.2d 211, that the Court of Appeals has held that post-arrest, post-*Miranda*, silence is inadmissible for "any purpose." As indicated, however, the Court's statement in *Grier* cited as support *Miranda*, 384 U.S. at 468 n. 37, 86 S.Ct. 1602, and *Doyle*, 426 U.S. at 619, 96 S.Ct. 2240, cases which held that post-*Miranda* silence was inadmissible as substantive evidence of guilt or to impeach an affirmative defense. The Court went on to discuss the Supreme Court's decision in *Robinson*, which, as discussed, held that it was permissible in some instances for the State to refer to a defendant's post-*Miranda* silence as a "fair response" to an issue generated by the defense.[12] *Grier*, 351 Md. at 261–62, 718 A.2d 211. Although the Court concluded that the defense in that case did "nothing to generate" a response by the State regarding the defendant's silence, *id.* at 262, 718 A.2d 211, the Court did not hold that Maryland, as a matter of State law, would not adopt the reasoning in *Robinson*. Indeed, by considering whether the evidence was admissible under the "fair response" doctrine, *id.*, the Court implicitly acknowledged that, or at least left open the issue whether, the "fair

---

11. This was the State's sole reference to appellant's post-*Miranda* silence; the State did not mention it in closing argument.

12. The Court also addressed whether the evidence was admissible pursuant to the "opening the door" doctrine, which it described as "a rule of expanded relevancy that, under limited circumstances, 'allows the admission of evidence that is competent, but otherwise irrelevant.' " *Grier v. State*, 351 Md. 241, 260, 718 A.2d 211 (1998) (quoting *Conyers v. State*, 345 Md. 525, 545, 693 A.2d 781 (1997)). Because the State used Grier's silence as substantive evidence of guilt, *id.* at 257, 718 A.2d 211, the Court held that the evidence was incompetent and therefore not admissible under this doctrine. *Id.* at 261, 718 A.2d 211.

response" doctrine could permit the State to reference a defendant's post-*Miranda* silence.

 We hold that, although a defendant's post-*Miranda* silence generally is inadmissible, the State may introduce such evidence when it is introduced in fair response to an issue that is generated by the defense regarding the defendant's interaction with the police. When a defendant creates the impression that he or she cooperated with the police, the State may introduce evidence of the defendant's post-*Miranda* silence to rebut that impression.

Here, the evidence of appellant's post-*Miranda* silence was introduced, not as substantive evidence of guilt or to impeach an affirmative defense, but to rebut the impression that appellant created regarding his intent to cooperate with the police. The trial court did not err or abuse its discretion in admitting this evidence.

## D.

### Request to Speak with Counsel

 Appellant next argues that "the trial court erred in permitting the State to introduce the fact that [appellant], when questioned by police, asked to speak with an attorney." Specifically, he asserts that "[t]he State's cross-examination of [appellant], and recall of Sergeant Sexton, was impermissible not only because it presented the jury with evidence of [appellant's] post-arrest silence, but—independent of that error, because it introduced evidence, through [appellant], that he 'asked for a lawyer,' and, through Sexton, that after [appellant] was Mirandized '[h]e said he would have to talk to a lawyer because those charges were very serious and he wanted to speak to a lawyer.'"

The State argues that appellant's contention is not preserved for this Court's review. On the merits, the State contends that "the evidence that [appellant] wanted to speak with counsel rather than speak with police was as likewise relevant and admissible as his post-arrest silence, in order to

fairly respond to and rebut his claim that he had every intention of fully cooperating with the police."

To assess the State's preservation argument, we review defense counsel's response below to the admission of this evidence. After appellant testified, the prosecutor approached the bench and argued that, based on appellant's testimony that he intended to speak to the police, appellant had opened the door to cross-examination regarding his post-arrest silence. Defense counsel disagreed that appellant was subject to cross-examination regarding his post-arrest silence, stating:

I don't think that he is. And the reason is because Mr. Lupfer originally did not think that there was going to be a serious charge such as murder brought against him. And when the police arrested him and told him that, he said, Oh, shit, this is more serious than I thought.... I better talk to my attorney.

The court agreed with the State that it could ask about appellant's post-arrest silence. The State then proceeded to question appellant about his activities after his arrest:

[PROSECUTOR]: Mr. Lupfer, after the police arrested you, they took you back to the police station, right?

[APPELLANT]: Yes, sir.

[PROSECUTOR]: And they asked you if you wanted to talk about what had happened, correct?

[APPELLANT]: No, they did not.

[DEFENSE COUNSEL]: Objection. I objected, Your Honor.

[THE COURT]: The objection and the reason therefore is on the record. Go ahead.

[PROSECUTOR]: They asked you if you wanted to talk about what happened; is that correct, Mr. Lupfer?

[APPELLANT]: No, sir. It's not correct. Would you like me to tell you what took place when I got there.

[PROSECUTOR]: Well, I'm sure they took your fingerprints and took your photographs. I mean, we know that so I'm not interested in that.

[APPELLANT]: Yes, sir.

[PROSECUTOR]: But I'm just wanting to know whether they offered you the opportunity to tell your side of the story.

[APPELLANT]: No. Before they slid the charges charging me with first degree murder, before they slid them charges in front of me, no, they did not give me a chance to say anything. And when I seen the charges, I asked for a lawyer.

The State subsequently called Sergeant Sexton as a witness, and the following occurred:

[PROSECUTOR]: What, if any, efforts did you make to question Mr. Lupfer about this case subsequent to arrest? And I take Mr. Brown's objection to be preserving the record for his earlier objection.

[THE COURT]: Overruled.

[SERGEANT SEXTON]: When we brought him back to the barrack, we placed him in an interview room. I came in with another investigator, Corporal or TFC Bachtell. Basically I sat down with [appellant] and advised him that—I asked him, I said, [appellant], you know why you're here, but before I start asking any questions of you, I'm going to read you your advice of rights, and I read them verbatim.

During that time [appellant] had asked me what he was being charged with. I told him he was being charged with murder as a result of what happened over in Timberbrook, and that's when **I read him his advice of rights and he elected not to answer any questions. He said he would have to talk to a lawyer because those charges were very serious and he wanted to speak to a lawyer.**

[PROSECUTOR]: Did you lay a formal set of written charges in front of him at that time?

[SERGEANT SEXTON]: Not at that time.

[DEFENSE COUNSEL]: Your Honor, may I have a continuing objection so that it's clear.

[THE COURT]: Yes, you do. You do.

[DEFENSE COUNSEL]: Thank you.

[SERGEANT SEXTON]: Not at that time. After the 180, or the Form 180, which is the Miranda form, was signed, I laid the charging documents there and he actually read them after he had objected to answering any questions.

(Emphasis added).

We agree with the State that, based on the above, appellant's complaint about the admission of evidence that he asked for a lawyer is not preserved for appellate review. The State's proffer of the evidence it desired to elicit, as well as the questions asked, were designed to elicit testimony regarding appellant's silence after his arrest, to rebut appellant's testimony regarding his intention to talk to the police and "get the situation straightened out." Although appellant made clear, at trial and on appeal, that he objected to the admission of evidence of appellant's post-arrest silence, he now raises a new contention of error.

On appeal, he argues that, even if his testimony "opened the door" to the admissibility of his silence, "[i]n no way was the door opened wide enough to permit the different, and additional, fact that [appellant] invoked his right to counsel." This argument was not raised below. When appellant volunteered that he requested to speak with a lawyer, defense counsel did not object or otherwise alert the court that an analysis different from that regarding the admission of his silence was required.

The Court of Appeals recently discussed the requirement that a litigant sufficiently raise claims of error in the trial court:

Maryland Rule 8–131(a) provides, in pertinent part: "Ordinarily, the appellate court will not decide any [ ] issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]" The purpose of Md. Rule 8–131(a) is " 'to ensure fairness for all parties in a case and to promote the orderly administration of law.' " *State v. Bell,* 334 Md. 178, 189, 638 A.2d 107, 113 (1994) (quoting *Brice v. State,* 254 Md. 655, 661, 255 A.2d 28, 31 (1969)). Fairness

and the orderly administration of justice is advanced "by 'requiring counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings.'" *Bell,* 334 Md. at 189, 638 A.2d at 113 (quoting *Clayman v. Prince George's County,* 266 Md. 409, 416, 292 A.2d 689, 693 (1972)). For those reasons, Md. Rule 8–131(a) requires an appellant who desires to contest a court's ruling or other error on appeal to have made a timely objection at trial. The failure to do so bars the appellant from obtaining review of the claimed error, as a matter of right.

*Robinson v. State,* 410 Md. 91, 103, 976 A.2d 1072 (2009).

Here, the questions propounded by the prosecutor were designed to elicit testimony about appellant's opportunity to tell his story to the police. At no time did the State's proffer, or questions asked, indicate an intent to elicit evidence of appellant's request for an attorney. When appellant, and thereafter Sergeant Sexton, volunteered that appellant requested to speak to an attorney, defense counsel was required, if he believed this evidence was inadmissible, to object or move to strike the testimony. *See State v. Jones,* 311 Md. 23, 29, 532 A.2d 169 (1987) (where defense counsel objected to testimony of witness, but the actual testimony was different from that initially objected to, and defense counsel did not make an additional objection or move to strike to give the court the opportunity to rule on the admissibility of the new testimony, the issue not preserved). Counsel's failure to make his objection known renders this claim unpreserved for this Court's review.

 Even if this issue was preserved for review, we would not find reversible error. In *Hunter v. State,* 82 Md.App. 679, 573 A.2d 85 (1990), this Court held that "it is impermissible for the State to offer evidence of, or comment upon, a criminal defendant's . . . attempt, request, or desire to obtain counsel in order to show a consciousness of guilt." This Court stated that " '[r]eversal has been ordered . . . when the prosecution

*has deliberately sought to capitalize on a request for counsel,* as by arguing the defendant must have had something to hide if he needed a lawyer before talking to the police.' " *Id.* at 687, 573 A.2d 85 (quoting *United States v. Daoud,* 741 F.2d 478, 480 (1st Cir.1984)). *Accord Martin v. State,* 364 Md. 692, 707, 775 A.2d 385 (2001) (finding error when "the State sought to draw an inference of guilt from petitioner's consultation with an attorney."). Other courts have recognized, however, that " '[i]ncidental references have not led to reversal.' " *Hunter,* 82 Md.App. at 687, 573 A.2d 85 (quoting *Daoud,* 741 F.2d at 480). *Accord Qureshi v. State,* 291 Ga.App. 708, 662 S.E.2d 806, 808 (2008) (no reversible error based on police officer's reference to Qureshi's invocation of his right to counsel where reference was "fleeting," prosecutor did not comment on Qureshi's request in closing argument, and there was no reasonable likelihood that request for counsel contributed to the verdict).

Here, evidence that appellant consulted an attorney was not admitted to show consciousness of guilt. Rather, the testimony was volunteered in response to questions designed to show that, although appellant testified that he intended to cooperate with the police, he chose not to do so after he was in police custody. The two brief references to appellant's request for a lawyer fairly can be characterized as "incidental" or "fleeting," and there was no mention of the request by the prosecutor in closing argument. Even if the issue was preserved for appellate review, we would find that it would not warrant reversal of appellant's convictions.

## II.

### Sequestration Order

Appellant's final contention is that the circuit court "abused [its] discretion in failing to afford [appellant] a remedy after ruling that several of the State's witnesses violated the court's sequestration order." He argues that, after finding a violation of the court's order, "some reasonable sanction . . . was called for," and the court abused its discretion when it "failed to fashion any effective remedy" for the violation.

The State contends that the trial court "did not find a clear violation of the sequestration order," and even if there had been a violation, the degree of prejudice from any violation was unclear. Thus, it argues, the trial court properly exercised its discretion in denying appellant's motion for a mistrial to strike witness testimony.

Maryland Rule 5–615 provides, in pertinent part, as follows:

(a) **In general.** Except as provided in sections (b) and (c) of this Rule, upon the request of a party made before testimony begins, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses.... The court may order the exclusion of a witness on its own initiative or upon the request of a party at any time. The court may continue the exclusion of a witness following the testimony of that witness if a party represents that the witness is likely to be recalled to give further testimony.[13]

\* \* \*

(d) **Nondisclosure**....

(2) The court may, and upon request of a party shall, order the witness and any other persons present in the courtroom not to disclose to a witness excluded under this Rule the nature, substance, or purpose of testimony, exhibits, or other evidence introduced during the witness absence.

(e) **Exclusion of testimony.** The court may exclude all or part of the testimony of the witness who receives information in violation of this Rule.

The purpose of a sequestration order pursuant to Rule 5–615 is " 'to prevent ... [witnesses] from being taught or prompted by each other's testimony.' " *Tharp v. State*, 362

---

**13.** Maryland Rule 5–615(b) provides that the court shall not exclude certain categories of people, including parents, experts, and victims of a crime of a delinquent act. Subsection (c) provides that "[t]he court may permit a child witness's parents or another person having a supportive relationship with the child to remain in court during the child's testimony."

Md. 77, 95, 763 A.2d 151 (2000) (quoting *Bulluck v. State,* 219 Md. 67, 70–71, 148 A.2d 433 (1959)). It is an attempt to avoid " 'an artificial harmony of testimony that prevents the trier of fact from truly weighing all the testimony; it may also avoid the outright manufacture of testimony.' " *Redditt v. State,* 337 Md. 621, 629, 655 A.2d 390 (1995) (quoting *Hurley v. State,* 6 Md.App. 348, 351–52, 251 A.2d 241 (1969)). *Accord Tharp,* 362 Md. at 95, 763 A.2d 151.

In this case, the court granted defense counsel's request to sequester all the witnesses. The court instructed the witnesses: "Do not discuss the matter with anybody except the attorneys until the case is over." Defense counsel subsequently advised the court of a potential violation of the court's sequestration order. Counsel explained:

> Your Honor, I've received a report, and there is a young woman who overheard a number of witnesses who testified yesterday, specifically Shannon Barr and . . . Jenna Webb. They were—Todd Slayman—were all discussing their testimony with Derek Patton, who is another witness who was in the bull pen, and they were permitted to speak with him; and I need to bring this to your attention so that we can inquire as to what the nature of that conversation was. I think that Mr. Kennedy was present and overheard some part of the conversation. I do not have firsthand knowledge of it, but Ms. Pam Hamilton does.

Ms. Hamilton then testified to various conversations that she had heard among the witnesses, including: (1) a man with a "long beard" [14] was in the hallway talking about "the children being outside" and that he saw "someone go to a truck"; [15] (2) Ms. Webb discussed her testimony with Mr. Kennedy, in the presence of Mr. Jackson, Ms. Barr, and Mr. Slayman and his son, including that she had heard arguing

---

**14.** The prosecutor stated that "Mr. Salisbury was the gentleman with the long beard Ms. Hamilton was describing."

**15.** When asked who else heard this conversation, Ms. Hamilton stated that her husband heard it. Her husband was not a witness at trial.

and gunshots, but "she didn't see anybody"; (3) Ms. Barr came out of the courtroom and told Mr. Slayman "what she saw about Derek, Matt and [appellant] running out the door"; and (4) Ms. Webb, Mr. Kennedy, and Mr. Jackson were speaking with Mr. Patton, but Ms. Hamilton could not determine what was being said. Ms. Hamilton testified: "They're all out there conversating about everything that's being said." [16]

Defense counsel moved for a mistrial. He argued that "there has been a wholesale ignoring of your sequestration order." Counsel argued that, when the witnesses concluded their testimony, "the last thing they heard [ ] from you was not to discuss their testimony, and the first thing that they do when they get out in the hallway is to discuss their testimony."

The prosecutor responded: "I don't believe that there's been evidence established of a need for a mistrial." He stated that "there's been no inquiry made of any of these witnesses that [counsel for appellant] has alleg[ed] could be tainted. That would be, in my view, at least the first step before any further decisions could be entertained."

The State then called Mr. Kennedy to the stand. Mr. Kennedy testified that he did not discuss Ms. Webb's testimony with her, and she did not discuss her testimony with anyone else. He further testified that he did not "overhear" anything from other witnesses. He did observe Ms. Webb speak to Mr. Patton, but the "only thing that was said" was that Mr. Patton "was supposed to be getting out Friday."

Counsel for appellant challenged the accuracy of Mr. Kennedy's testimony. He continued:

There is no way that Ms. Hamilton would know what was said in here yesterday unless—unless she had overheard somebody talking about it; and there was information that she conveyed that is not in any of the police reports, that's

---

16. At this point, Mr. Kennedy, Mr. Jackson, and Mr. Patton had not yet testified, but Mr. Slayman, his son, and Ms. Barr had testified.

not contained in any part of the investigation. You would have had to have been in this courtroom yesterday to have overheard it, for her to know what had been said.

The prosecutor argued: "I just don't think there has been any prejudice or any taint here."

In denying appellant's motion for a mistrial, the court stated:

From what I have heard so far on this particular issue, it does appear that there was a contravention of the sequestration order by virtue of people having some sort of discussions out in the hallway regarding testimony that had occurred in the courtroom.

The extent to which this took place is unclear; and I don't feel under the total circumstances of the facts in this case, that what happened elevates to such a statu[r]e to justify a mistrial at this junction of the proceedings; and I won't go into any more factual detail. I don't think that's necessary.

So the motion for mistrial is denied.

Mr. Bailiff, at this time we're going to take a break. You can let the jury have a break as well. What I do want you to do during the course of the recess, round up as many of the witnesses as you can out in the hallway. I don't want to do this in open court; but tell them that they are subject to sequestration, and if I receive any information whatsoever that they were having any discussions whatsoever about this case, any whatsoever, they're going to be brought in before me, given an opportunity to respond as to why they should not be held in contempt of court, and they are going to sit in jail for a week.

At the close of the State's case, defense counsel renewed his motion for a mistrial. Alternatively, he requested that the court "strike the testimony of the laywitnesses who talked to each other. . . ." The court denied defense counsel's motions "for reasons previously stated."[17]

---

**17.** In subsequently denying appellant's motion for a new trial, the court stated:

 "When there has been a violation of a sequestration order, whether there is to be a sanction and, if so, what sanction to impose, are decisions left to the sound discretion of the trial judge." *Redditt,* 337 Md. at 629, 655 A.2d 390. *Accord Muhammad v. State,* 177 Md.App. 188, 286, 934 A.2d 1059 (2007), *cert. denied,* 403 Md. 614, 943 A.2d 1245 (2008). We will not reverse a trial court's decision regarding whether sanctions should be imposed absent an abuse of discretion. *See Brown v. State,* 124 Md.App. 183, 207, 720 A.2d 1270 (1998), *cert. denied,* 353 Md. 269, 725 A.2d 1067 (1999). "An abuse of discretion occurs where no reasonable person would take the view adopted by the [trial] court, or when the court acts without reference to any guiding rules or principles." *Barksdale v. Wilkowsky,* 192 Md.App. 366, 387, 994 A.2d 996 (2010) (citation and quotations omitted).

The sanctions requested by appellant in this case, a mistrial or the striking of witness testimony, are harsh sanctions. *See Redditt,* 337 Md. at 629, 655 A.2d 390 (because " 'the ascertainment of the truth is the great end and object of all the proceedings in a judicial trial,' " the "complete exclusion of the testimony of witnesses for a violation of the sequestration rule is not lightly to be imposed as a penalty upon even an offending party") (quoting *Frazier v. Waterman Steamship Corp.,* 206 Md. 434, 446, 112 A.2d 221 (1955)); *Wilder v. State,* 191 Md.App. 319, 345, 991 A.2d 172 (2010) ("the 'declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice.' ") (quoting *Cooley v. State,* 385 Md. 165, 173, 867 A.2d 1065 (2005)). We find no abuse of discretion here in the trial court's denial of appellant's motions.

---

I do recall hearing that there had been discussion in the hallway between witnesses and potential witnesses. The Court brought them into open court. There was questioning of the witnesses. I was assured that there was no discussion relating to the facts of the case being presented before the jury; therefore, there was no finding of violation of any sequestration order. There was discussion but there was no discussion about the case, according to what I heard here in open court.

 The court did appear to find a violation of the sequestration order, stating there were some discussions among the witnesses in "contravention of the sequestration order." As the State points out, however, a critical consideration for the court to consider in exercising its discretion regarding what, if any, sanction should be imposed for a violation of a sequestration order, is "the degree of schooling in the details of the evidence obtained by the potential witness as a result of the sequestration order violation." *Redditt,* 337 Md. at 632, 655 A.2d 390.

Here, there was no evidence that the witnesses discussed details that would influence another witness' testimony. Accordingly, we find no abuse of discretion in the court's denial of appellant's motions for a mistrial or to strike witness testimony.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**